201-10

STATE OF MAINE           SUPERIOR COURT
WALDO, SS.                 CIVIL ACTIONS

Cindy M. Cunningham,
    Plaintiff

v.                      Docket No. CV-08-3

F. George Johnson, DDS,
    Defendant

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

Amanda J. Edmands,
    Plaintiff

v.                      Docket No. CV-08-5

F. George Johnson, DDS,
    Defendant

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

Meghan F. Porter,
    Plaintiff

v.                      Docket No. CV-08-6

F. George Johnson, DDS,
    Defendant

## DECISION AND JUDGMENT

A consolidated hearing was held in these separate actions on April 12, 2010.

Each plaintiff was present with her attorney. The defendant appeared through counsel.

1

In these actions, the plaintiffs contend that their employer, defendant F. George Johnson, DDS, violated the Maine Human Rights Act (MHRA), *see* 5 M.R.S. § 4551 *et seq.*, because they were subjected to a hostile work environment. The plaintiffs also claim that that Johnson is liable to them based on violations of administrative rules promulgated by the Maine Human Rights Commission. For the reasons set out below, the court enters judgment for the plaintiffs on their MHRA claims. However, they have not proven the contents of any regulatory requirements that may have applied in their workplace, and so they cannot prevail on those causes of action.

At the times relevant to these cases, Johnson operated two businesses: the Home Port Inn, and the Mermaid Restaurant and Pub. Johnson appears to have run these businesses as proprietorships. He hired each of the three plaintiffs to work as his employees. Plaintiff Cindy Heald (formerly Cindy Cunningham) worked for him as a cook and housekeeper. Johnson hired her in August 2005. She considered leaving at the end of 2005 because he could not give her the work hours she wanted. However, Johnson promised to increase her hours and improve her benefits if she continued to work for him. She agreed to this arrangement and stayed.

Johnson also hired Heald's daughter, plaintiff Amanda Nash (formerly Amanda Edmands) in August 2005. Because she then had some difficulty with him as a supervisor, she left her employment with him in December 2005 but agreed to return to work for him again later that month on the condition that her mother (Heald) would be her supervisor.

Plaintiff Meghan F. Porter was hired in mid-January 2006. She worked for Johnson as a waitress in the restaurant and pub and as a bartender.

Another of Johnson's employees was one Phillip Nickerson, who, at the times relevant here, worked as a cook. All three plaintiffs allege that beginning in January 2006 and continuing through the time they were no longer employed by Johnson, Nickerson engaged in repeated acts of sexually objectionable conduct and repeatedly made sexually objectionable comments. The court finds the plaintiffs' accounts of Nickerson's conduct to be credible. Nickerson once grabbed Heald's buttocks; he slapped her on the buttocks; he attempted to grab (or created the appearance that he was attempting to grab) one of her breasts with a pair of kitchen tongs; and he started to pull

2

his pants down to expose his genital area. In Heald's presence, Nickerson talked about having sex with a 13-year old girl; she was within view when he showed Porter a photograph that showed him participating in oral sex[1]; and he described for her (Heald) a sex act he wanted to perform with her on the pub premises. Heald also heard Nickerson talk with another cook about oral sex.

Nickerson asked Nash, in indirect but umistakeable terms, if she wanted to have sex with him. He also talked in her presence about having sex with a 13-year old girl; he talked about having sex with Heald (her mother); and she was present when Nickerson asked the co-employee about oral sex.

When Porter worked at the pub and restaurant, Nickerson asked her if she wanted to have sex with him in the closet (this was the same comment that Nickerson made to Nash); and he talked of having sex with a 13-year old virgin. Nickerson showed Porter photographs of nude woman that he stored on his cell phone, and in fact Nickerson held the display screen on the phone directly in front of Porter's face; he slapped her on the buttocks with a wet towel, leaving a welt; he grabbed her buttock; and he started to pull his pants down to show her that he was not wearing any underwear.

Starting in mid to late-January, Heald and Nash complained to Johnson about Nickerson's conduct. Heald did so several times when Johnson was in his office, and she complained to him another time when he was in the pub. In addition to the times that Heald confronted Johnson about this situation, Nash talked with Johnson several other times, and once she was with Heald when Heald registered her complaint with him. Porter was with Heald during one of the times when Heald complained to Johnson, and Porter told Johnson that Heald's complaints were true.

Despite being told of these complaints, Johnson's responses were uniform: he tried to deflect the issue and showed no sign of taking any action. Heald finally told Johnson that if he would not listen to her, then someone at the Maine Human Rights Commission would. Johnson responded that he was going to close his business in a couple of weeks anyway and that he did not care if she reported the matter. In fact,

---

[1] Although Nickerson denied most of the allegations made of his actions and comments, he did acknowledge that he had pornographic photographs stored on his cell phone and that they may have been visible to others at work.

3

Heald, at least, did file an administrative complaint. In May 2006 – several months after the plaintiffs had stopped working for Johnson, he received notice of the complaint from the agency. Johnson then approached Nickerson – apparently for the first time – and directed him to sign an acknowledgement reciting that he (Johnson) would not tolerate sexual harassment of other employees.

By then, however, the plaintiffs no longer worked for Johnson. Heald and Nash both terminated their employment with Johnson in late February because of the adverse and hostile work environment created by Nickerson. Earlier in February, Porter's employment had ended also, although her hours had decreased steadily because business was slow, and although Johnson terminated Porter's employment (as opposed to Heald and Nash, who left on their own initiative), on this record, that separation cannot be attributed to the conditions of employment.

The MHRA protects an employee from work environments that are hostile because of sexual harassment. *Watt v. Unifirst Corp.*, 2009 ME 47, ¶ 22, 969 A.2d 897, 902. In order to establish this type of violation of rights created by the MHRA, the aggrieved employee must prove

> (1) that she (or he) is a member of a protected class; (2) that she was subject to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

*Id.*, 969 A.2d at 903. The question of whether a work environment is hostile within the meaning of the MRHA is a factual one and implicates consideration of

> all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Id.*, ¶ 23, 969 A.2d at 903.

Each plaintiff has established that she was subjected to a hostile work environment created by Nickerson's actions. Nickerson physically assaulted Heald and Porter through conduct that was directly or indirectly sexualized. He also made

4

statements to all three plaintiffs that were demeaning and profoundly offensive. These statements included proposals to all three women to have sex with them, and he even told Nash that he wanted to have sex with her mother and described the nature of the act he wanted to perform on her.

The workplace became so badly infected by Nickerson's wrongful conduct that Heald and Nash quit their jobs. Prior to that time, they were affected emotionally by the hostile environment. From this, the court finds that the plaintiffs have established that the workplace was a hostile, abusive and demeaning environment arising from sexual harassment.

An employer becomes liable for a MHRA violation of this nature, even if the employer is not the immediate source of the sexual harassment, "where the employer knew or should have known of the charged sexual harassment and failed to take immediate and appropriate corrective action." *Watt*, 2009 ME 47, ¶ 27, 969 A.2d at 904. Here, Johnson had actual knowledge of Nickerson's conduct, because all three plaintiffs told him about it repeatedly. Then, Johnson chose a path of inaction and did nothing in response. The situation continued to the point where Heald and Nash left their employment positions. Based on the *Watt* standard defining the circumstances of an employer's liability for co-employee conduct, the plaintiffs here have established Johnson's liability under the MHRA.

Each plaintiff seeks damages for non-pecuniary emotional distress. Any such damage award is limited to $20,000, because there is no evidence that Johnson's business had more than 14 employees. *See* 5 M.R.S. § 4613(2)(B)(7). The plaintiffs also seek an award of lost wages or back pay. *See* 5 M.R.S. § 4613(2)(B)(2). The plaintiffs are not entitled to an award of attorney's fees, because the predicate to such an award has not been established on this record. *See* 5 M.R.S. § 4622(1).

As is noted above, Nickerson initiated physical contact with Heald, or threatened to do so, several times. He also told her about the way he wanted to have sex with her. For this or for other reasons, Heald made the greatest number of attempts to persuade Johnson to intervene and stop Nickerson's conduct. The court awards her damages of $15,000. The evidence is insufficient to allow a quantification of lost wages, and so the court denies that part of Heald's claim.

5

Nash also suffered emotional distress as a result of the hostile work environment. Although Nickerson did not initiate physical contact with her, he chose to tell her about acts that he wanted to perform on her own mother. At that time, Nash was 17 years old. He also asked her if she wanted to have sex with her and, in her presence, discussed having sex with an adolescent. Nash's work environment deteriorated to the point where, because of this hostility and abuse, she felt compelled to leave her job. The court awards her damages of $10,000 for emotional distress. She has not presented evidence that would allow a computation of lost wages.

Porter was Johnson's employee for a more limited period of time, and the evidence suggests that she worked fewer hours than Heald and Nash. Despite this, Nickerson had physical contact with Porter, slapping her with a towel with sufficient force to leave a welt and, another time, grabbing her buttocks. He proposed having sex with her, displaying photographs of nude women in a way that she could not avoid seeing the images and engaging in other highly offensive conduct. The court awards Porter $10,000 in damages for pain and suffering. The court denies her claim for lost wages, because the evidence does not establish that she was terminated from employment due to any circumstance associated the hostile work environment.

The entry shall be:

In Cunningham v. Johnson (CV-08-3), judgment on count 1 is entered for the plaintiff in the amount of $15,000, plus pre-judgment interest at the annual rate of 4.42%, post-judgment interest at the annual rate of 6.41%, and her costs of court. On counts 2 and 3, judgment is entered for the defendant.

In Edmands v. Johnson (CV-08-5), judgment on count 1 is entered for the plaintiff in the amount of $10,000, plus pre-judgment interest at the annual rate of 4.42%, post-judgment interest at the annual rate of 6.41%, and her costs of court. On counts 2 and 3, judgment is entered for the defendant.

In Porter v. Johnson (CV-08-6), judgment on count 1 is entered for the plaintiff in the amount of $10,000, plus pre-judgment interest at the annual rate of 4.42%, post-judgment interest at the annual rate of 6.41%, and her costs of court. On counts 2 and 3, judgment is entered for the defendant.

Dated: April 26, 2010

_____
Justice, Maine Superior Court