STATE OF MAINE
CUMBERLAND, ss.

BUSINESS & CONSUMER COURT
CIVIL ACTION
DOCKET NO. BCD-CIV-2022-00027

MICHAEL WHITTIER AND
NANCY WHITTIER,

        Plaintiffs,

    v.

CENTRAL MAINE MEDICAL
CENTER,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

ORDER DENYING DEFENDANT
CENTRAL MAINE MEDICAL
CENTER'S MOTION FOR
SUMMARY JUDGMENT

## INTRODUCTION

The motion before the court tests the scope of the continuing negligent treatment theory of recovery. On March 31, 2022, Plaintiffs Michael Whittier and Nancy Whittier ("Plaintiffs") filed a four-count complaint against Central Maine Medical Center ("CMMC"). Plaintiffs' Complaint alleges causes of action against CMMC for medical malpractice (Count I), fraudulent concealment (Count II), continuing negligent treatment (Count III) and loss of consortium[1] (Count IV). (Compl. ¶¶ 30-46.) Before the court is CMMC's Motion for Summary Judgment under Maine Rule of Civil Procedure 56(b), wherein it seeks summary judgment on all of Plaintiffs' claims. The court heard argument on CMMC's motion on January 4, 2023. For the reasons discussed below, the court DENIES in part CMMC's motion as to Counts I, III and IV, but GRANTS a summary judgment for CMMC on Plaintiffs' Count II.[2]

---

[1] Because Mrs. Whittier's claim for loss of consortium also requires proof of negligence and causation, the parties did not address Count IV in their briefs. (*See* Def.'s Mot. Summ. J. 1 n.1.) However, for the same reasons the court denies summary judgment on Plaintiffs' medical malpractice and continuing negligent treatment claims, it denies summary judgment for CMMC on Plaintiffs' loss of consortium claim.

[2] During oral argument, Plaintiffs acknowledged that they will not pursue their fraudulent concealment claim any further and conceded a summary judgment should issue for CMMC on Plaintiffs' Count II.

1

## STANDARD OF REVIEW

Summary judgment is appropriate when the parties' statements of material facts and the portions of the record referenced therein "disclose no genuine issues of material fact and reveal that one party is entitled to judgment as a matter of law." *Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶ 11, 915 A.2d 400 (citing M.R. Civ. P. 56(c)). "A material fact is one that can affect the outcome of the case, and there is a genuine issue when there is sufficient evidence for a fact finder to choose between competing versions of the fact." *Lougee Conservancy v. CitiMortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774 (quoting *Stewart-Dore v. Webber Hosp. Ass'n*, 2011 ME 26, ¶ 8, 13 A.3d 773). The Court must view the record facts in the light most favorable to the non-moving party and must draw all reasonable inferences in favor of the same. *Watt v. UniFirst Corp.*, 2009 ME 47, ¶ 21, 969 A.2d 897 (citations omitted); *Levis v. Konitzky*, 2016 ME 167, ¶ 20, 151 A.3d 20.

When the defendant is the moving party, it must establish that there is no genuine dispute of fact and that the undisputed facts would entitle it to judgment as a matter of law. *Diviney v. Univ. of Me. Sys.*, 2017 ME 56, ¶ 14, 158 A.3d 5. To withstand a defendant's motion for summary judgment, the plaintiff must in turn establish a prima facie case for each element of their cause of action. *Watt*, 2009 ME 47, ¶ 21, 969 A.2d 897 (citations omitted). If they do not present sufficient evidence on the essential elements, then the defendant is entitled to a summary judgment. *Id.*

## FACTS

The court finds the that the Plaintiffs generated the following genuine issues of material fact.

**I. The parties.**

CMMC is a Maine corporation and integrated health care services provider based in Lewiston, Maine, that provides hospital, primary care and other services. (Def.'s S.M.F. ¶ 1; Pls.' S.M.F. ¶ 2.) At all times relevant to this case, CMMC operated primary care offices in central Maine, including the Mechanic Falls Family Practice (the "Mechanic Falls Office") and, in Auburn, the Minot Avenue Family Medicine (the "Minot Avenue Office") practice. (Def.'s S.M.F. ¶¶ 3-4.) CMMC's family practice offices employed CMMC employees, including physicians and other practitioners, and utilized CMMC's electronic medical recordkeeping software systems. (Def.'s S.M.F. ¶ 5.) CMMC's primary services employees and practitioners were hired and trained by CMMC, and they were expected to follow the same policies and procedures even though they may not work at the same hospital or family practice location. (Pls.' S.M.F. ¶ 3.)

Michael Whittier ("Whittier") began a relationship with CMMC as a patient at the Mechanic Falls Office, where he saw numerous physicians over the years. (Def.'s S.M.F. ¶ 6; Pls.' S.M.F. ¶ 5.) Christopher Short, D.O., and James Ostrander, D.O., are physicians who were employed by CMMC and who treated Whittier between 2016 and 2020. (Def.'s S.M.F. ¶ 3.)

**II. Events prior to June 4, 2018.**

    **a. Whittier's ongoing care with CMMC.**

Dr. Short was employed by CMMC and practiced at the Mechanic Falls Office during 2016. (Def.'s S.M.F. ¶¶ 2-3.) On January 25, 2016, Whittier saw Dr. Short for a physical examination. (Def.'s S.M.F. ¶ 7; Pls.' S.M.F. ¶ 7.) During the examination, Dr. Short observed that Whittier's prostate was enlarged, and he ordered a prostate-specific antigen test ("PSA"). (Def.'s S.M.F. ¶ 7; Pls.' S.M.F. ¶ 7.) Dr. Short ordered other blood tests for Whittier during the examination, too. (Def.'s S.M.F. ¶ 7.)

3

CMMC gave its patients the option of having their labs drawn at external labs, such as St. Mary's Regional Medical Center ("St. Mary's"). (Pls.' S.M.F. ¶ 8.) Whittier elected to have his PSA done at St. Mary's, and not at CMMC's own lab. (Def.'s S.M.F. ¶ 8.) Whittier's PSA result was 12.70, which is elevated, abnormal, and indicative of a high-risk for prostate cancer. (Def.'s S.M.F. ¶ 9; Pls.' S.M.F. ¶ 9.) On or about January 29, 2016, Whittier's PSA and other blood test results were transmitted by St. Mary's to Dr. Short by fax sent to the Mechanic Falls Office. (Def.'s S.M.F. ¶ 10; Pls.' S.M.F. ¶ 10.)

Dr. Short was away on vacation when the fax with Whittier's PSA result arrived. (Pls.' S.M.F. ¶ 12.) Dr. Short permitted qualified employees, such as the triaging nurse, to in his absence review and sign-off on "normal" lab test results on his behalf. (Pls.' S.M.F. ¶ 14.) A CMMC employee other than Dr. Short received the fax transmitting Whittier's test results, including the PSA, reviewed them, stamped them "Reviewed Dr. Short," and scanned them into Whittier's electronic medical record.[3] (Def.'s S.M.F. ¶ 42; Pls.' S.M.F. ¶¶ 11, 13.) Because the PSA was so marked it was not left for Dr. Short's review when he returned from vacation the following month, and he did not review it. (Pls.' S.M.F. ¶ 16.) Whittier alleges that he was not informed of his elevated PSA during 2016, either in person or by letter. (Def.'s S.M.F. ¶ 11; Pls.' S.M.F. ¶ 17.)

Plaintiffs' expert, Dr. Andrews, testified that Dr. Short and his staff were required to notify Whittier of the 2016 PSA result and the risk that it demonstrated for prostate cancer, to recommend repeat testing, and to refer him to a urologist for further evaluation. (Pls.' S.M.F. ¶

---

[3] The parties dispute who the employee was who reviewed and stamped the PSA result, whether that person was employed at the Mechanic Falls Office or a CMMC employee temporarily visiting from another office, and whether they grasped the significance of the elevated PSA result. (Pls.' S.M.F. ¶ 13.) They also dispute whether Dr. Short allowed only his triaging nurse to review and stamp "normal" lab results on his behalf, or whether he permitted other, non-practitioner staff to do so. (Pls.' S.M.F. ¶ 14.) In any event, Whittier's PSA reported an "abnormal" result. Further, it is undisputed that it would be inconsistent with CMMC's policies and procedures for a physician to permit any non-practitioner employee to sign off on a patient's lab tests results. (Pls.' S.M.F. ¶ 15.)

4

55a.) Their failure to do so constituted a violation of the applicable standard of care. (Pls.' S.M.F. ¶ 55a.) Likewise, Dr. Andrews testified that Dr. Short's failure to personally review and stamp the 2016 PSA result was a deviation from the standard of care owed to Whittier. (Pls.' S.M.F. ¶ 55b.)

Whittier next saw Dr. Short at the Mechanic Falls Office for a physical examination on April 7, 2017. (Def.'s S.M.F. ¶ 13.) Dr. Short testified that he learned of Whittier's elevated PSA prior thereto. (Pls.' S.M.F. ¶ 18.) Dr. Short planned to order a follow-up PSA, as was his practice in response to abnormal, elevated PSA results, and he recorded a note to that affect during the April 7 examination. (Def.'s S.M.F. ¶¶ 14, 16; Pls.' S.M.F. ¶ 18.) Whittier had no lab work done during 2017.[4] (Def.'s S.M.F. ¶ 17.) According to Dr. Andrews, Dr. Short's failure to follow-up with Whittier about the second PSA would constitute a deviation from the standard of care in the context of Whittier's elevated 2016 PSA. (Pls.' S.M.F. ¶ 55c.)

Dr. Short left his employment with CMMC at the Mechanic Falls Office during September 2017. (Def.'s S.M.F. ¶ 18.) Around that time, CMMC decided to close the Mechanic Falls Office. (Def.'s S.M.F. ¶ 19; Pls.' S.M.F. ¶ 21.) CMMC announced this change to its Mechanic Falls Office patients, who were encouraged to transfer their care to other CMMC family practices in the area, like the Minot Avenue Office. (Def.'s S.M.F. ¶¶ 19, 21.) Whittier elected to transfer his medical care to the Minot Avenue Office. (Def.'s S.M.F. ¶ 20.)

### b. CMMC consolidated its patients' electronic medical records, including Whittier's, beginning during the Spring of 2018.

For inpatient care, CMMC has long-used an electronic medical recordkeeping system known as Cerner Power Chart ("Cerner"). (Def.'s S.M.F. ¶¶ 34, 47.) From 2010 to 2018,

---

[4] The parties dispute whether Dr. Short informed Whittier of the elevated PSA result or the need for Whittier to undergo a follow-up PSA, whether the follow-up PSA was actually ordered, and whether anybody from CMMC or the Mechanic Falls Office followed-up with Whittier about the second PSA after the appointment. (Def.'s S.M.F. ¶¶ 15-17; Pls.' S.M.F. ¶¶ 17-20.)

CMMC's off-campus and outpatient care provider offices like the Mechanic Falls Office and the Minot Avenue Office used another system, Centricity. (Def.'s S.M.F. ¶ 35.) Beginning during the Spring of 2018 CMMC's off-campus offices, including the Minot Avenue Office, transitioned to and began using Cerner. (Def.'s S.M.F. ¶ 36.) CMMC was involved with this process.[5] (Pls.' S.M.F. ¶ 24.) It was common for CMMC's practitioners, wherever they worked, to receive lab results for their patients from both CMMC's internal labs and external labs like St. Mary's. (Def.'s S.M.F. ¶ 46.)

In Centricity, a patient's labs performed by CMMC automatically uploaded, or flowed, into their electronic medical record ("EMR"). (Def.'s S.M.F. ¶ 44.) The results of labs performed externally by other providers were sent to the CMMC practitioner who ordered them and to clinical staff and health information management staff, and then were uploaded into the patient's Centricity EMR. (Def.'s S.M.F. ¶¶ 43, 45.) EMRs displayed lab results in a flowsheet in spreadsheet-table format, and users could review summary lab results from the EMR main screen or select a tab to open and view a patient's entire history of lab records. (Def.'s S.M.F. ¶ 41.)

Similar to Centricity, in Cerner there is a main screen that displays the patient's "primary care workflow" along with other patient information (e.g., medical history, identified or document health problems, allergies). (Def.'s S.M.F. ¶ 48.) Also like Centricity, Cerner features a labs flowsheet that lists results from a patient's past lab tests that is accessible from the EMR main screen. (Def.'s S.M.F. ¶ 49.) Prior to and after integration, the results of patients' lab tests performed by CMMC automatically flowed into the labs flowsheet in their Cerner EMR. (Def.'s S.M.F. ¶ 50; Pls.' S.M.F. ¶¶ 25-26.) After integration, externally-performed labs also

_____

[5] Cerner is used in hospitals nationwide, but it is not an "off-the-rack" product and its design may be customized according to a specific client's needs. (Pls.' S.M.F. ¶ 23.) The parties dispute whether CMMC provided input for the design of the Cerner system it used. (Pls.' S.M.F. ¶ 24.)

6

automatically loaded into the labs flowsheet in Cerner. (Pls.' S.M.F. ¶ 25.) On the other hand, to access externally-performed labs taken before integration, users had to locate and select a "labs and diagnostics" folder in an EMR.[6] (Def.'s S.M.F. ¶¶ 51, 52; Pls.' S.M.F. ¶ 27, 28.) Apart from Cerner, patients' lab test results were viewable in Centricity through 2020. (Def.'s S.M.F. ¶ 52.)

During the transition from Centricity to Cerner, technical training specialists oriented and trained CMMC providers, including at the Minot Avenue Office. (Def.'s S.M.F. ¶¶ 37, 60.) Trainings covered how to search for the results of patients' past internal and external labs. (Def.'s S.M.F. ¶ 60.) CMMC imported patients' EMR data from Centricity to their Cerner EMR. (Def.'s S.M.F. ¶ 57.) Also during this time, CMMC providers had concurrent access to both EMR systems through 2020.[7] (Def.'s S.M.F. ¶¶ 39, 55, 62.)

Whittier visited the Minot Avenue Office on April 16, 2018, to establish care there and for a physical examination with Dr. Ostrander. (Def.'s S.M.F. ¶ 22.) By this time, CMMC's off-campus practices like the Minot Avenue Office already transitioned their EMRs to Cerner. (Pls.' S.M.F. ¶ 29.) Dr. Ostrander's practice was to review each of his patient's history of lab results in their EMR at each office visit. (Pls.' S.M.F. ¶ 32.) Whittier's EMR listed his enlarged prostate among his medical issues. (Pls.' S.M.F. ¶ 35.) However, during the appointment Dr. Ostrander did not open the "lab and diagnostics" folder in Whittier's EMR that contained Whittier's history of lab results, including the 2016 PSA result.[8] (Pls.' S.M.F. ¶ 33.) Dr. Ostrander testified that a glitch prevented him from accessing Whittier's history of lab results, but he was also unaware of

---

[6] The parties dispute whether the results of Whittier's labs performed by external providers prior to CMMC's implementation of Cerner at its off-campus offices, including the 2016 PSA, were available in Cerner during 2018. (Def.'s S.M.F. ¶¶ 51-55.)

[7] Patients' EMRs, including lab results, were also available during this time to providers on the "Health Info Net" web-based platform. (Def.'s S.M.F. ¶¶ 63-64.) The parties dispute whether CMMC employees were trained to access EMRs on Health Info Net. (Def.'s S.M.F. ¶¶ 63-64.)

[8] The parties dispute whether Whittier's 2016 PSA result was uploaded to his Cerner EMR, and whether Dr. Ostrander himself was properly trained on how to view Whittier's history of external labs. (Def.'s S.M.F. ¶ 54.)

how the results of a patient's external labs taken before the transition flowed into Cerner and how to access them. (Pls.' S.M.F. ¶¶ 30, 31.) Because Dr. Ostrander did not see the 2016 PSA, he did not inform Whittier about it. (Pls.' S.M.F. ¶ 33.) Had he seen it, Dr. Ostrander would have referred Whittier to a urologist. (Pls.' S.M.F. ¶¶ 34, 40.)

Dr. Andrews testified that Dr. Ostrander was required to familiarize himself with Whittier's recent medical history (including notes from recent office visits, annual physical examinations and lab test results) when Whittier presented as a new patient at the Minot Avenue Office. (Pls.' S.M.F. ¶ 55d.) According to Dr. Andrews, had Dr. Ostrander reviewed Dr. Short's notes from Whittier's 2017 annual physical examination, as he was required to do, he would have seen documentation of the abnormal 2016 PSA and the plan for follow-up testing. (Pls.' S.M.F. ¶ 55d.) Dr. Ostrander was required to understand that the 2016 PSA had not been acted upon properly and the 2017 plan for follow-up testing had not been completed. (Pls.' S.M.F. ¶ 55d.) Dr. Andrews added that Dr. Ostrander's failures to review Whittier's medical history, ensure completion of follow-up testing and refer Whittier to a urologist would deviate from the standard of care owed to Whittier. (Pls.' S.M.F. ¶ 55d.) This is especially true in the context of Whittier's enlarged prostate, about which Dr. Ostrander was required to follow up to determine whether a PSA test was ever performed and what it showed. (Pls.' S.M.F. ¶ 55e.) Failure to do this was also a deviation from the standard of care. (Pls.' S.M.F. ¶ 55e.)

III. **Events after June 4, 2018.**

On September 27, 2018, Whittier saw Dr. Ostrander and complained of "body aches, fatigue for months" and an ongoing headache. (Pls.' S.M.F. ¶ 37.) Dr. Ostrander noted that the symptoms had "gotten worse over the last six months," and acknowledged Whittier's enlarged prostate. (Pls.' S.M.F. ¶ 37.) Dr. Ostrander provided a broad differential diagnosis because he

8

did not know what was causing Whittier's health issues, and he ordered a suite of lab tests including for arthritis, thyroid disease, and Lyme disease. (Def.'s S.M.F. ¶ 25; Pls.' S.M.F. ¶ 37.) However, Dr. Ostrander again did not review Whittier's history of prior external lab results. (Pls.' S.M.F. ¶ 38.) Consequently, Dr. Ostrander did not order a follow-up PSA for Whittier during the appointment. (Pls.' S.M.F. ¶ 39.) Nor did he take any steps to determine whether a PSA had been ordered previously, and if so, what its result was. (Pls.' S.M.F. ¶ 39.)

Dr. Andrews testified that these omissions again caused Dr. Ostrander's medical care to violate the standard of care that he owed to Whittier. (Pls.' S.M.F. ¶¶ 55f, 55g.) First, Dr. Ostrander remained unaware of how Cerner was implemented such that test results obtained from external labs did not populate on the flowsheet in the main screen of patients' EMRs. (Pls.' S.M.F. ¶ 55f.) Hence, Dr. Ostrander wrongfully assumed that all of Whittier's test results appeared in his EMR's flowsheet. (Pls.' S.M.F. ¶ 55f.) Relatedly, according to Dr. Andrews, CMMC's failure to set up Cerner to enable physicians to view at once all of a patient's lab test results, or in the alternative to train physicians that additional steps were required to view test results from external labs taken before implementation of Cerner, violated the standard of care that it owed to Whittier. (Pls.' S.M.F. ¶ 55f.) This caused CMMC's physicians like Dr. Ostrander to not understand that they had to look for those results beyond a patient's EMR flowsheet. (Pls.' S.M.F. ¶ 55f.)

Second, Dr. Andrews testified that Dr. Ostrander was required to address Whittier's enlarged prostate, which was not addressed during their previous visit, and to determine whether Whittier had undergone PSA testing. (Pls.' S.M.F. ¶ 55g.) Also, Dr. Ostrander was required to review Whittier's prior medical history, as he was still a new patient at the Minot Avenue Office. (Pls.' S.M.F. ¶ 55g.) Finally, Dr. Ostrander was required to understand that the 2016 PSA had

9

not been followed-up on, and that planned retesting had not been completed. (Pls.' S.M.F. ¶ 55g.)

Dr. Ostrander remained unaware of Whittier's 2016 PSA result during October 2018 when he received the results of the broad range of tests that he ordered for Whittier the month before.[9] (Pls.' S.M.F. ¶¶ 38-39, 41.) Dr. Andrews testified that since Dr. Ostrander had not reviewed Whittier's medical history as of October 2018, the standard of care newly required him to do so upon receiving the test results. (Pls.' S.M.F. ¶ 55h.) On January 21, 2019, Dr. Ostrander ordered a new PSA for Whittier, but that order was deemed a mistake and cancelled. (Pls.' S.M.F. ¶ 42.)

Whittier moved to North Carolina during late 2019 and established new primary care there with Mark Braun, M.D. (Def.'s S.M.F. ¶ 26; Pls.' S.M.F. ¶ 43.) On April 30, 2020, Dr. Braun ordered a PSA for Whittier, which resulted in an elevated result of 9.50. (Def.'s S.M.F. ¶ 27.) Dr. Braun called Whittier to inform him of his elevated PSA result on May 15, 2020. (Pls.' S.M.F. ¶ 44.) On or around May 18-19, 2020, Whittier called the Minot Avenue Office and engaged in a telehealth visit with Dr. Ostrander when they discussed the April 30, 2020, PSA result, and Dr. Ostrander ordered additional PSA screening and referred Whittier to a urologist. (Def.'s S.M.F. ¶ 28; Pls.' S.M.F. ¶ 45.)

On June 30, 2020, Whittier presented to a urologist affiliated with CMMC, who informed Whittier that his 2016 PSA result was 12.70. (Def.'s S.M.F. ¶ 29; Pls.' S.M.F. ¶ 46.) Whittier reported that he never knew that his 2016 PSA disclosed an elevated and abnormal result. (Pls.' S.M.F. ¶ 46.) On August 7, 2020, Whittier underwent a biopsy of his prostate, which

---

[9] Here, again, the parties dispute whether during October of 2018 Dr. Ostrander reviewed Whittier's medical history, whether Dr. Ostrander again missed Whittier's 2016 PSA result because he was unaware how to properly navigate the new EMR system or because of a system glitch, and whether Dr. Ostrander consequently developed a treatment plan without reviewing Whittier's medical history. (Pls.' S.M.F. ¶ 41.)

demonstrated an aggressive adenocarcinoma of the prostate. (Pls.' S.M.F. ¶ 47.) Subsequently, Whittier consulted other urologists with CMMC who confirmed his diagnosis and the extent of his cancer, and recommended treatments options (either radical prostatectomy or definitive radiation therapy). (Pls.' S.M.F. ¶¶ 48-49.) On November 12, 2020, Whittier underwent a radical prostatectomy, which revealed the cancer spread beyond his prostate. (Def.'s S.M.F. ¶ 30; Pls.' S.M.F. ¶ 50.)

**IV. Plaintiffs' suit.**

The progression of Whittier's aggressive cancer resulted in ongoing side effects, including hot flashes, chronic fatigue, erectile and urinary incontinence. (Pls.' S.M.F. ¶ 51.) On June 4, 2021, the Plaintiffs filed a Notice of Claim. (Def.'s S.M.F. ¶ 32.) On March 31, 2022, the Plaintiffs filed their four-count complaint in the Superior Court. (Def.'s S.M.F. ¶ 33.)

DISCUSSION

According to the Maine Health Security Act ("MHSA"), 24 M.R.S. §§ 2501-2988 (2022), actions for professional negligence against health care providers and practitioners must be commenced within 3 years after the cause of action accrues. 24 M.R.S. § 2902 (2022). The MHSA defines "health care provider" as "any hospital, . . . or other facility in which skilled nursing care or medical services are prescribed by or performed under the general direction of persons licensed to practice medicine." *Id.* § 2502(2) (2022). A cause of action accrues under the MHSA on the date of the act or omission giving rise to the plaintiff's injury. *Id.* § 2902 (2022).

To prevail in any action for negligence, including professional negligence, the plaintiff must prove that the defendant owed them a duty of care, that the defendant breached their duty to the plaintiff, and that the defendant's breach proximately caused the plaintiff's injury. *Graves v.*

11

*S.E. Downey Registered Land Surveyor*, 2005 ME 116, ¶ 10, 885. A.2d 779. Proximate cause is generally a question for the factfinder, but the court may grant summary judgment to a defendant when the plaintiff's allegations amount to no more than mere speculation or conjecture. *See Merriam v. Wanger*, 2000 ME 159, ¶ 10, 757 A.2d 778 (citations omitted). Otherwise, judgment as a matter of law is improper if any reasonable view of the evidence could sustain a finding of proximate cause. *Houde v. Millett*, 2001 ME 183, ¶ 11, 787 A.2d 757.

The Law Court interprets the MHSA to permit a single cause of action for professional negligence where multiple acts or omissions combine to proximately cause a plaintiff's injury. *Baker v. Farrand*, 2011 ME 91, ¶¶ 23-24, 26 A.3d 806.

> [A] plaintiff may bring a single action alleging continuing negligent treatment that arises from two or more related acts or omissions by a single health care provider or practitioner where each act or omission deviated from the applicable standard of care and to at least some demonstrable degree, proximately caused the harm complained of, as long as at least one of the negligent acts or omissions occurred within the three years of the notice of claim.

*Id.* ¶ 29. This is the "continuing negligence" theory. It is applicable only where the tortious acts and omissions are related. *Id.* Further, they must, in combination, proximately cause the plaintiff's injury. *Id.* ¶ 24. "If so, the single cause of action must accrue from the date of the last act or omission that contributed to the alleged injury because only then was the alleged negligence complete." *Id.* This means that the cause of action accrues for the purposes of the MHSA's three-year statute of limitations period "on the date of the last act or omission by the health care provider … that contributed to the proximate causation of the patient's harm." *Id.* ¶ 25. In essence, to survive summary judgment, the Plaintiffs must show: (1) negligent acts within the statute of limitations, (2) that they are related and caused the Plaintiffs' damages, and (3) that they were committed by the same hospital provider.

CMMC argues that Plaintiffs' claims against CMMC under theories of vicarious liability, which relate to the purported negligence of its employee-practitioners that accrued after the statutory period, are not permitted by the continuing negligence theory as adopted in Maine. (Def.'s Mot. Summ. J. 12.) CMMC further argues that the Plaintiffs cannot prevail on a theory of continuing negligence because they cannot point to any negligent acts that occurred within the three-year statutory period preceding their June 4, 2021, notice of claim. (Def.'s Mot. Summ. J. 2.)

## I. Plaintiffs have generated genuine issues of material fact regarding instances of CMMC's negligence that occurred after June 4, 2018.

There is evidence that Dr. Ostrander's practice was to review his patient's medical history at each visit. He was an employee of CMMC at the time. When Whittier presented to Dr. Ostrander during September 2018, Dr. Ostrander did not review Whittier's medical history or prior lab results because he did not open the "labs and diagnostics" folder in Whittier's EMR. Had he done so, he would have located Dr. Short's 2017 record of Whittier's elevated PSA, the 2016 PSA result itself, as well as notes about planned follow-up testing. During October 2018, Dr. Ostrander again did not review Whittier's full medical history, including prior lab results, when he received the results of the global labs he ordered for Whittier on September 27.

The Plaintiffs have generated genuine issues of material fact that Dr. Ostrander's failure to review Whittier's medical history was because the electronic records system did not make them readily apparent, because Dr. Ostrander was not properly trained, or because he failed to follow his training. These facts provide a reasonable inference that CMMC was negligent in failing to locate and act upon Whittier's 2016 PSA test (1) during Whittier's September 2018 appointment and (2) when Dr. Ostrander revisited Whittier's EMR after receiving test results during October 2018.

13

## II. The conduct was by a single health care provider.

When the Law Court adopted the continuing negligence theory, it declared that " a plaintiff may bring a single action alleging continuing negligent treatment that arises from two or more related acts or omissions by a single health care *provider*." *Baker*, 2011 ME 91, ¶ 29, 26 A.3d 806 (emphasis added). According to the MHSA, "provider" means "any hospital, . . . or other facility in which skilled nursing care or medical services are prescribed by or performed under the general direction of persons licensed to practice medicine." *Id.* § 2502(2) (2022). Generally, an employee's negligence is imputed to their employer when it occurs in the course of their employment. *See Legassie v. Bangor Publ. Co.*, 1999 ME 80, ¶ 5, 741 A.2d 442. So too, a corporation commits negligence through the acts or omissions of its agents and employees. *See, e.g., Campbell v. Portland Sugar Co.*, 62 Me. 552, 566 (1873).

A plain reading of the applicable common law and statutes permits an action for continuing negligence against a hospital provider for the negligence of its employees. The court sees no basis to isolate the conduct of one employee from the conduct of another employee. The court cannot say that, as a matter of law, Plaintiffs' continuing negligence claim must fail because the relevant conduct was not the conduct of a single health care provider.

## III. The court cannot find that the acts and omissions within and prior to the statute of limitations are unrelated or that they did not proximately cause Plaintiffs' injuries as a matter of law.

The Plaintiffs have raised genuine issues of material fact whether the acts and omissions by CMMC's employee-practitioners from 2016 through September and October 2018 combined to cause Whittier's injury. Each relates to CMMC's failure to inform Whittier about his 2016 PSA, or to act upon it.

## CONCLUSION

14

Based on the foregoing, the entry will be: Defendant Central Maine Medical Center's Motion for Summary Judgment is DENIED as to Plaintiffs' Counts I, III and IV, but is GRANTED as to Plaintiffs' Count II.

The Clerk is requested to enter this Order on the Docket, incorporating it by reference pursuant to Maine Rule of Civil Procedure 79(a).

Date: 1/30/23

Thomas R. McKeon
Justice, Business & Consumer Court

Entered on the docket: 01/31/2023

15