STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-09-330

ℝℇℂ ℭ.ᵁᵐ. 7/23/2010

TRUDY LITTLE,
    Plaintiff

STATE OF MAINE
Cumberland, ss, Clerk's Office

JUL 23 2010

RECEIVED

v.

SAINT JOSEPH'S MANOR,
    Defendant

ORDER ON DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT

## BEFORE THE COURT

Defendant Saint Joseph's Manor (hereinafter "SJM" or "Defendant") has

filed a motion for summary judgment pursuant to M.R. Civ. P. 56 on Plaintiff

Trudy Little's (hereinafter "Little" or "Plaintiff") Complaint.

## PROCEDURAL BACKGROUND

On June 4, 2009, Little filed a Complaint alleging workplace

discrimination in violation of the Civil Rights Act,[1] the Rehabilitation Act,[2] the

Americans with Disabilities Act (hereinafter "ADA"), 42 U.S.C. §§ 12131-12134,

and the Maine Human Rights Act (hereinafter "MHRA"), 5 M.R.S. §§ 4551-4651,

specifically alleging sex discrimination (Count I), hostile work environment

---

[1] Little does not specify whether her claims under the Civil Rights Act are based on the Federal Civil Rights Act, 42 U.S.C. §§ 1981-2000h-6, or the Maine Civil Rights Act, 5 M.R.S. §§ 4681-4683. For the purposes of this summary judgment order, this Court evaluates Little's claim based on the Maine Civil Rights Act.

[2] It is not clear whether Little asserts claims under the Federal Rehabilitation Act, 29 U.S.C. § 794 et seq. (2010), or the Maine Rehabilitation Act, 26 M.R.S. §§ 1411-1421. For the purposes of this motion the court evaluates Little's claim based on the Maine Rehabilitation Act. While the Maine Rehabilitation Act requires the Commissioner of Labor to adopt a grievance procedure for discrimination on the basis of a disability, unlike the Federal Rehabilitation Act, 29 USC § 794, the Maine Rehabilitation Act does not specifically provide a cause of action for discrimination. Because the Federal District Court for the District of Maine dispensed with Plaintiff's federal claims, this court will only address Plaintiff's claims based on Maine law.

1

harassment (Count II); constructive discharge (Count III), and disclosure of confidential information (Count IV). On June 30, 2009, the case was removed to the United States District Court for the District of Maine upon the Defendant's motion. The parties proceeded with discovery consistent with the terms of the scheduling order issued by the Federal District Court. Upon completion of discovery, the Defendant filed a motion for summary judgment in the federal court. The motion was fully briefed by both parties, and the Federal District Court heard oral argument on the motion on March 26, 2010. The Honorable Judge D. Brock Hornby of the Federal District Court entered by oral order summary judgment for SJM on the Plaintiff's federal claims, and remanded the case to the State Superior Court for the remaining state claims.

## FACTUAL BACKGROUND[3]

Little was employed by SJM as a cook supervisor between May 29, 2006 and July 28, 2007. During Little's employment, Mary Cote (hereinafter "Cote") was SJM's Human Resources Manager. Cote provided Little with her new employee orientation on June 20, 2006, and as part of orientation Little received a copy of SJM's employee handbook. During her employment, Little was directly supervised by Food Services Director Adam Barrows (hereinafter "Barrows") and Assistant Food Director Jill N. Bookataub (hereinafter "Bookataub"). As the Assistant Food Director, Bookataub had some supervisory authority over the cooks and food service workers, however Bookataub had no authority to fire,

---

[3] In response to SJM's motion for summary judgment. Little filed a two paragraph affidavit signed on February 9, 2010. The affidavit will be disregarded because it contradicts former testimony. *see Schindler v. Nilsen*, 2001 ME 58 ¶ 9, 770 A.2d 638, 641-42 (stating that a party may not submit an affidavit attempting to create disputes of fact by making statements contrary to that party's prior testimony), and because it is unsworn, in violation of M.R. Civ. P 56(e), which requires affidavits submitted in support of summary judgment to be sworn or certified.

discipline, or take other actions that might affect the terms and conditions of employment of the cooks and food service workers, including Little. Little understood that she was to go to Barrows[4] or Bookataub with any complaints about her job. Also during Little's employment, Faith Stilphen (hereinafter "Stilphen") was SJM's Director of Nursing. Stilphen did not supervise Little, but she was a supervisor of other departments at SJM, and testified during her deposition that she felt she had a duty to respond to possible violations of SJM's sexual harassment policy.

At all relevant times, Joe Mitchell (hereinafter "Mitchell") was a cook supervisor at SJM. He did not supervise Little, except for when Little worked on Thursdays as the spare cook. Mitchell did not have the authority to affect the terms and conditions of Little's employment, nor did he exercise the authority to hire or terminate any employee during Little's employment. According to SJM, Mitchell is gay, which SJM asserts was made known to Little during the first week of her employment. Little argues that the evidence does not support that Mitchell is gay, and that his conduct raises questions about whether he is sexually interested in women.

SJM's employee handbook contains a sexual harassment policy with clear guidance to employees who believe they have been subjected to harassment. SJM's sexual harassment policy states that SJM "will not tolerate any form of sexual harassment by supervisors and co-workers." The "policy is intended to prohibit offensive conduct, either physical or verbal, that threatens human dignity and employee morale, and which interferes with a positive and

---

[4] Barrows attended harassment/ sexual harassment training sessions provided by SJM to its supervisors on May 4, 2005 and on December 6, 2007.

productive work environment." During Little's employment, SJM used a formal grievance procedure, which instructed employees to direct issues involving their employment to Cote's department in writing. SJM's sexual harassment policy states: "Supervisors and managers are responsible for monitoring behavior which can be construed to be harassment and for initiating necessary action to eliminate such behavior." Under the policy, any SJM employee who feels that he or she is a victim of sexual harassment may immediately report the matter to his or her supervisor, or the Human Rights Director. The policy further states that SJM "will immediately investigate any complaints of sexual harassment and where warranted, take disciplinary action against any employee engaging in sexual harassment."

### 1. Mitchell's Conduct

In July of 2006, Mitchell gave Little a handwritten note to give to her boyfriend George Asali, whom Mitchell had never met. In the note, Mitchell wrote "George – Bring me home some good Shiraz [and] I'll stop doing Trudy in the cooler! She likes to finger my ass! Then smell it! Love Joey." (Little Depo, Ex. 4). Little did not discuss this note with Stilphen and Barrows more than one time. After the first note, Mitchell sent Little several text messages.[5] Some of the text messages included sexual content, such as "Trudy has big ones, takes up the whole kitchen;" "Send me a pic of your tit;" and "Did Serri in the middle room twice." The only co-worker Little told about the text messages was Sherry Poitras, who is not a supervisor. Little never discussed or showed Mitchell's text messages to any SJM supervisor. A couple of months after the first note, Mitchell

---

[5] The parties dispute how many of the text messages were work related, and how many were sex-specific.

gave Little another note to give to George in which Mitchell bragged about masturbating at work. (Little Depo, Ex. 5). Little never showed this note to anybody at SJM.

In December 2006, Mitchell gave Little a Christmas card to deliver to her adult son, in which Mitchell claims to have had sex with Little twice. (Little Depo, Ex. 7). Little testified that when she confronted Mitchell about the Christmas card and told him that she did not appreciate it, Mitchell responded by saying "it's a fucking joke, Trudy." Little testified that she complained to Stilphen about the note Mitchell sent to George and the Christmas card. Little testified that she had several conversations with Stilphen about Mitchell's inappropriate conduct, although she does not recall exactly how many. Stilphen felt that Barrows, as Little's supervisor, needed to known about the Christmas card. Stilphen reported to Barrows that Little was upset by the card, and made it clear that there were sexual connotations to it. Stilphen offered to be present with Barrows when Barrows met with Mitchell about the card, however Barrows declined saying that Mitchell was on vacation and that he would speak with both Mitchell and Little. Barrows testified that after speaking with Stilphen about the Christmas card he did not do anything to look into the issue. Stilphen testified that when she followed up with Barrows about the card, Barrows told her he had taken care of the issue.

SJM claims that Little did not say anything about this card to anyone at SJM other than Mitchell and Stilphen. Little testified that Bookataub also knew about the card. SJM claims that when Stilphen "checked in" with Little following discussions about the Christmas card, Little assured her that things were fine. Little denies ever assuring Stilphen that "things were fine". The parties dispute

the number of sex-related notes Mitchell gave to Little, but Little estimates that there were three to four additional sex-related handwritten notes, although Little does not remember exactly what they said. SJM argues, and Mitchell testified in his deposition, that Mitchell wrote the notes and text messages as a joke and that Little encouraged him to write notes that were bizarre to make her boyfriend laugh.

In addition to the text messages and handwritten notes, Mitchell made comments directly to Little about her breasts and breast size, and made other comments that had sexual connotations that Little thought were offensive and hurtful. On one occasion at the end of a meeting and in the presence of supervisors Bookataub and Barrows, as Little stood up to leave Mitchell fell back and said "get those fucking things out of my face, Trudy," referring to Little's breasts. Little claims that this made her extremely embarrassed. Barrows was present when Mitchell made this remark at the meeting, and he perceived that Little and Mitchell were laughing and joking around. He responded by telling Little and Mitchell "that's enough." Bookataub testified that she heard Mitchell make sexual comments to Little, including comments about Little's breasts. Bookataub did not take any action in response to Mitchell's comments to Little because she perceived that Mitchell and Little were joking. Bookataub also testified during her deposition that two or three times Mitchell commented on her (Bookataub's) breasts if she was wearing a revealing top.

Little states that Mitchell referred to her as "ugly" "all the time." On one occasion, Little was excited about getting contact lenses, and Mitchell said to her "Don't bother, Trudy, you can't hide ugly." On another occasion, Little came to work with her daughter-in-law and two grandchildren to show them where she

6

worked, and in the presence of her family, Mitchell came by and commented to Little that she was still ugly. SJM disputes the frequency with which Mitchell called Little ugly, pointing out that Little was only able to support this assertion with evidence of two instances in which Mitchell referred to her as ugly.

Little complained to Barrows about Mitchell calling her ugly when she was getting contact lenses. Little testified that Barrows confronted Mitchell in her presence over the incident, and that Mitchell declared, "fuck her if she can't take a joke . . . I call it as I see it, Adam." Little testified that in response Barrows did not say anything to Mitchell and returned to his office, leaving Little embarrassed. Little also testified that Barrows was present when Mitchell called her ugly in front of her family, and then when Barrows confronted Mitchell, Mitchell again responded, "fuck her if she can't take a joke."

Barrows tells a different story. Barrows testified that he was not present when Mitchell called Little ugly after she announced she was getting contact lenses. Barrows stated that Little did report this incident to him, but that she did not want Barrows to address Mitchell about the situation. Barrows told Little that he would pay attention to Mitchell and address the issue with him if it ever happened again. Barrows stated that when Little brought her grandchild to SJM, he overheard Mitchell say "how can someone so ugly produce a beautiful baby like that." Barrows claims that Little laughed in response, and that when Little left, he confronted Mitchell and told Mitchell his comment was inappropriate. Barrows stated that Mitchell responded by saying he was kidding.

According to Little, Mitchell frequently made comments to her and others about his genitals and about their sexual activity. According to Little, on one occasion Mitchell was upset with Nadine Nyder, a female a co-worker, so in

7

Little's presence, Mitchell took Nyder's coffee cup, stuck his hands down his pants, and then rubbed his hands on the lip of the co-worker's cup. Little testified that when she told Mitchell what he did was horrible, Mitchell responded with laughter. Little testified during her deposition that on four to five occasions, Mitchell told Bookataub that he would love to go to bed with her. Little acknowledges that Mitchell's comments to Bookataub were part of an on-going banter.[6] Def.'s Response to Pl.'s SAMF, ¶ 26 citing Little Dep. p. 131. However, Little testified that these comments made her feel uncomfortable because the sexual topics were inappropriate for the workplace. (Little Dep. pp. 131-132). SJM claims that Mitchell referred to his genitalia at work only once while Little was employed by SJM. In April or May of 2007, Sue LaRoche, the cook supervisor for the evening shift, complained to Barrows that Mitchell was

---

[6] The following questions and answers are from Little's deposition.

> Q (Attorney LaMourie): They – they saw Mr. Mitchell – they saw this – they saw his behavior in connection with you every day? Is that your testimony?
> A (Little): Not necessarily with me, in particular. They did see a lot that was to do with me. But his behavior on a daily basis in front of the bosses was never – they never did anything. It was accepted. It was accepted behavior. He used to say to Jill [Bookataub], I'd love to go to bed with you tonight or – and she'd give it right back. Why would I say something to these people if they were involved in it?
> Q: So Mr. Mitchell used to say that to Jill?
> A: To Jill, yeah, all the time.
> Q: How often did you hear him make that comment?
> A: Probably four or five times.
> Q: And how – how would she respond?
> A: She'd laugh and say, come on, Joe, let's go or –
> Q: Did you ever say to Jill that it made you uncomfortable to hear those comments?
> A: No. What would be the point. She thought they were funny. You know I had already complained to Adam, which I'm sure he told Jill. They all just thought I was – couldn't take a joke.

Little Dep., 131:4-23.

talking about his penis and/or erection while at work. In response Barrows spoke to Mitchell and Mitchell apologized.

Little had troubles with anxiety and panic attacks. She claims that Barrows and Stilphen were the only people she told about her panic disorder at SJM. Little testified that a few days before giving her notice of resignation, Barrows called Little into his office because she seemed more nervous and Little told Barrows of her panic attacks. Little further testified that Mitchell made her panic disorder worse. According to Little, the day after she spoke with Barrows, she went to work and Mitchell got in her face and asked "how her mental condition was." Little stated that Mitchell then went to people whom she supervised and told them to be nice to her tonight because she is crazy. Little believes Mitchell learned of her panic disorder through Barrows. Little states that she had to leave her job at SJM because of Mitchell's harassment, and because Barrows told Mitchell about her panic disorder. Little says a few days after leaving her employment at SJM, Mitchell called her to ask why she left. Little testified that she told Mitchell that Barrows disclosure of her medical condition was the last straw and that she could not continue to work with Mitchell.

Barrows testified that Little had discussed with him having anxiety on several occasions. Barrow claims that he never told Mitchell about Little's anxiety disorder. Mitchell testified that he knew about Little's anxiety because they got along and shared things with each other. Mitchell says that Little told him shortly after she started at SJM that she suffered from anxiety and a panic disorder. Additionally, Mitchell testified that when he spoke with Little on the

phone after she left SJM, Little told him she quit because she could not stand Barrows or Bookataub.

### 2. Co-Workers' Observations of Little and Mitchell and Co-Workers' Interactions with Mitchell

According to SJM, at least five SJM employees recall that they observed Mitchell and Little talking, teasing, and joking with each other on numerous occasions, and that Mitchell and Little appeared to be friends and acted friendly towards each other. According to Barrows, he often observed Little and Mitchell laugh and share jokes, and he perceived that they were friends. Bookataub testified that she never observed Little seem uncomfortable in Mitchell's presence, nor did she get any indication that Mitchell's conduct toward her was unwelcome. Stilphen also testified that she had the impression that Mitchell and Little got along. Little claims that she and Mitchell were not friends, and that she complained to Mitchell and made complaints to management about his conduct. According to SJM, Mitchell's other co-workers, both male and female, got along with him and had no problems or issues with him at work, and Mitchell was helpful to Little and to all the other male and female employees who worked in the kitchen at SJM.

Mitchell testified during his deposition that he did not think his actions were hurtful or offensive. Mitchell stated during his deposition that he got along with Little. He stated that he interacted with Little in the manner he did because they were friends who joked with each other.

### 3. Notice of Complaint

According to SJM, during Little's employment at SJM, SJM's Director of Human Relations Mary Cote spoke with Little and interacted with her on many

occasions. Cote stated that Little never made any verbal or written complaints to her about Mitchell. Cote also stated that no employee ever brought a complaint to her attention involving inappropriate behavior by Mitchell directed at Little. During Little's employment, Cote was never shown any documents, notes, or records written by Mitchell that were given to Little. According to Cote, Little did not utilize the complaint procedure set forth in SJM's employee handbook pertaining to sexual harassment. Cote states that she first learned of Little's complaints about Mitchell when she received a copy of Little's filing with the Maine Human Rights Commission after Little had resigned. Cote began her investigation immediately after she received a copy of the filing. Cote did not become aware of the handwritten notes Mitchell gave to Little until after copies of them were provided to the Maine Human Rights Commission, at which point she took action to investigate them. Cote states that her investigation concluded that Mitchell's other co-workers perceived Mitchell and Little were friends, and none of the co-workers felt that Mitchell engaged in behavior that created a sexually hostile work environment. Following Cote's investigation, Mitchell was subject to disciplinary action.

Barrows testified that during Little's employment he heard that Little had complaints about work, and that he responded by "checking in" with Little on four or five occasions. Barrows used these "check-ins" as an opportunity to see how Little was doing and to give her an opportunity to share any specific issues she might be having at work. Barrows testified that during these "check-ins" Little told him she was unhappy with her job. Barrows observed that Little never seemed uncomfortable in Mitchell's presence, and that he never saw Little object to anything Mitchell said or did, with the exception of a time when Mitchell

11

called Little ugly. Barrows testified that at no time did Little complain to him that Mitchell was a cause of her anxiety.

In contrast, Little states that Barrows received frequent notice that Mitchell was sexually harassing her. Little further responds that she did use the SJM's procedure for reporting sexual harassment claims because she complained to supervisors – Stilphen and Barrows – about the notes, the Christmas card, and Mitchell's conduct. Little testified that a few days before she left her employment she told Barrows that Mitchell's harassment was exacerbating her panic disorder. She further points out that Barrows testified that it was his responsibility under SJM's procedure to pass notice of possible sexual harassment to Cote. Little claims that if Barrows followed SJM's procedure, then Cote knew/should have known about her complaints about Mitchell's conduct, and about the notes when Stilphen and Barrows initially brought them to Cote's attention. Little claims that Mitchell was disciplined following Cote's investigation because the evidence establishes that he sexually harassed her.

Little never: (1) wrote down her concerns about Mitchell's behavior in order to share them with anyone; (2) asked anyone at SJM if her shift could be changed so that she would not have contact with Mitchell; (3) asked anyone at SJM if she could move her work station away from Mitchell; (4) never talked to Bookataub about Mitchell's behavior, or told Bookataub that Mitchell's conduct made her feel uncomfortable; and (5) never showed Bookataub any notes or documents that she had received from Mitchell. Additionally, no other SJM employee approached Bookataub to report or complain about Mitchell's behavior directed at Little.

Little's resignation letter was left in Barrow's mailbox on July 28, 2007. (Little Depo, Ex. 6).[7] While the resignation note refers to Mitchell, it makes no allegation of misconduct by him. Little did not meet with Cote in advance of her resignation for any reason. Barrows claims that Little made no attempt to give him notice that she intended to quit her job. Little also never gave Bookataub notice that she would be leaving. Additionally, Stilphen testified that Little never gave her a reason for leaving her employment, except that she wanted to work where it was air conditioned. In contrast, Little testified that she met with Barrows and gave him three days notice. Little states that she told Stilphen the last straw occurred when Barrows told Mitchell of her anxiety disorder, and Mitchell made fun of her medical condition. Little decided to file a charge of harassment against SJM approximately three weeks after she resigned, because her sisters encouraged her to do so.

## DISCUSSION

### 1. Standard of Review

In a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party to decide whether the parties' statements of material facts and the referenced record material reveal a genuine issue of material fact. *Rogers v. Jackson*, 2002 ME 140, ¶ 5, 804 A.2d 379, 380 (citations omitted). The court gives the party opposing summary judgment the benefit of any inferences that might reasonably be drawn from the facts presented. *Curtis v. Porter*, 2001 ME 158, ¶ 9, 784 A.2d 18, 22. If the record

---

[7] The resignation letter states:
"I really hate to do this to you guys, but I feel I have no alternative. My "condition" as Joe [Mitchell] so eloquently put it, is getting too much for me to handle right now. I can't seem to control it this time, so I have found a part time job with a lot less stress . . . ."

reveals no genuine issue of material fact then summary judgment is proper. *Id.* at ¶ 6, 784 A.2d at 21.

A contested fact is "material" if it could potentially affect the outcome of the suit under the governing law. *Inkel v. Livingston*, 2005 ME 42, ¶ 4, 869 A.2d 745, 747. A fact is "genuine" if there is sufficient evidence supporting the claimed fact to require a fact-finder to choose between competing versions of facts at trial. *Id.* For the purposes of summary judgment, factual disputes and ambiguities must be resolved against the movant. Nevertheless, when the facts offered by a party in opposition to summary judgment would not, if offered at trial, be sufficient to withstand a motion for judgment as a matter of law, summary judgment should be granted. *Rodrigue v. Rodrigue*, 1997 ME 99, ¶ 8, 694 A.2d 924, 926. A defendant moving for summary judgment has the burden to assert those elements of the cause of action for which the defendant contends there is no genuine issue to be tried. *Corey v. Norman, Hanson & DeTroy*, 1999 ME 196, ¶ 9, 742 A.2d 933, 938. "A party seeking summary judgment always bears the initial responsibility of informing the . . . court of the basis for its motion." *Id.* *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).

## 2. Sex Based / Gender Based Discrimination and Sexual Harassment

Count I of Little's Complaint is pled as sex/gender based discrimination in violation of the Maine Human Rights Act (hereinafter "MHRA").[8]

---

[8] The Maine Human Rights Act prohibits employment discrimination on the basis of sex and physical or mental handicap as follows:

> It shall be unlawful employment discrimination in violation of this Act . . .
>> A. For any employer to fail or refuse to hire or otherwise discriminate against any applicant for employment because of . . . sex, sexual orientation, physical or mental handicap . . . or because of any such reasons to discharge an employee or discriminate with respect to hire, tenure, promotion,

14

However, in their summary judgment briefs the parties treat Count I as a "hostile sexual environment harassment" claim. (Pl's Opp. to Def.'s M. for Summ. J. at 3). Because the facts in the record do not support a claim for gender-based discrimination,[9] the court addresses Little's claim as a claim for sexual harassment.

SJM argues that it is entitled to summary judgment on Little's sex/gender discrimination claim "because Little has advanced no evidence to demonstrate she was subjected to harassment based upon or because of her sex and cannot establish a basis for employer liability." (Def.'s Mot. for Summ. J. at 4). The MHRA authorizes employment-related claims of sexual harassment based on a hostile work environment. *See* 5 M.R.S. § 4572(1)(A); *see also Watt v. Unifirst Corp.*, 2009 ME 47, ¶ 22, 969 A.2d 897, 902-03 (stating that both the federal Civil Rights Act and the MHRA recognize unlawful employment discrimination based on sexual harassment sufficiently severe or pervasive to create a hostile work environment).[10] To succeed on such a claim, the First Circuit has required that, pursuant to the MHRA, a plaintiff must demonstrate:

---

> transfer, compensation, terms, conditions or privileges or employment, or any other matter directly or indirectly related to employment. . . .

5 M.R.S. § 4572(1)(A).

[9] Generally in an employment discrimination claim based on gender, the plaintiff must make a prima facie case that shows disparate treatment between men and women. *Maine Human Rights Comm'n v. Dep't of Corrections*, 474 A.2d 860, 865 (Me. 1983). In such cases, the plaintiff makes a prima facie showing of disparate impact "where an employer's practice (such as a written or oral test, or a particular job requirement) is facially neutral but in fact affects more harshly one group than another." *Id.* citing *Maine Human Rigths Comm'n v. Auburn*, 408 A.2d 1253, 1264 (Me. 1979).

[10] It is appropriate for the court to look to analogous federal case law for guidance in the interpretation of the Maine Human Rights Act. *See Bowen v. Dep't of Human Servs.*, 606 A.2d 1051, 1053 (Me. 1992). In *Maine Human Rights Comm'n v. Local 1361, Me.*, the

15

(1) that she (or he) is a member of a protected class; (2) that she was subject to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

*Watt*, ¶ 22, 969 A.2d at 903-02. "For sexual harassment to be actionable, it must be sufficiently severe or pervasive, 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Mentor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (alteration in original) quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11ᵗʰ Cir. 1982); *see also Bowen v. Dep't of Human Servs.*, 606 A.2d 1051 (Me. 1991).

The inquiry in a sexual harassment hostile work environment claim is fact intensive. A hostile work environment claim requires an examination of "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Doyle v. Dep't of Human Servs.*, 2003 ME 61, ¶ 23, 824 A.2d 48, 56 (quotation marks omitted). Whether the conduct is so severe as to cause the environment to become hostile or abusive is left to the determination of the trier of fact. *Nadeau v. Rainbow Rugs, Inc.*, 675 A.2d 973, 976 (Me. 1996). Even if a hostile work environment exists, an employer may evade liability if "it exercised

---

Law Court noted that "structural and linguistic similarities" between the Maine Human Rights Act and the federal Civil Rights Act suggested "the employment discrimination provisions in [the MHRA] were intended to be the state counterparts of the Federal Act. 383 A.2d 369 (1978). The Law Court concluded that decisions by federal courts interpreting the federal statute provided significant guidance in the construction of Maine's statute. *Id.*

16

reasonable care to prevent and correct" the alleged harassment and if the plaintiff "unreasonably failed to take advantage of" the employer's preventative or corrective measures. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

Generally, a "hostile environment harassment claim involves a pattern of inappropriate conduct, [however] there is no requirement that harassment occur more than one time in order to be actionable." *Nadeau*, 675 A.2d at 976. For example, in *Nadeau* the Law Court found support for a sexual harassment claim when an employer offered money for sex to an employee on one occasion, left the offer on the table, and requested that the employee subsequently lie about their interactions to employees. *Id.* In contrast, vulgar and inappropriate language alone has been found insufficient to support a sexual harassment claim. *See Fontanez-Nunez v. Jansesen Ortho, LLC*, 447 F.3d 50, 57 (1st Cir. 2006) (where the court found that a co-worker's vulgar language and behavior was inappropriate in the workplace and completely unprofessional, but that the conduct was not related to the reasons the plaintiff's employment was terminated and did not unreasonably interfere with or alter the plaintiff's work conditions).

a. **Mitchell's Harassment Was Based on Sex**

It is undisputed that Little is a member of a protected class because she is a female and she claims she was subjected to sexual harassment in the workplace. The court now addresses whether Little was subject to unwelcome sexual harassment based on sex. Citing *Oncale v. Sundowner Offshore Servs.*, SJM claims that Little cannot show that Mitchell's conduct was based on sex. *Oncale*, 523 U.S. 75, 80-81 (1997). SJM claims that the fact that Mitchell is gay (a fact Little disputes) precludes Little from making the inference that Mitchell's

17

statements were motivated by a sexual desire, and SJM further claims that Little cannot show that Mitchell's conduct was based on some general hostility toward the presence of a woman in the workplace. *Oncale*, 523 U.S. at 80-81.

The court disagrees. In *Oncale*, the U.S. Supreme Court held that same-sex sexual harassment in the workplace was actionable under Title VII of the Civil Rights Act. *Oncale*, 523 U.S. at 79 citing 42 U.S.C. § 2000e-2(a)(1). The core of the Supreme Court's holding in *Oncale* can be broken into two prongs: A plaintiff alleging sexual harassment needs to show that (1) the discrimination was "because of sex,"[11] and (2) that the harasser's conduct was so objectively offensive as to alter the conditions of the victim's employment." *Oncale*, 523 U.S. at 81. The fact that Mitchell may be gay and that Little is a female has no bearing on whether Mitchell's conduct may be considered sexual harassment. The *Oncale* court held that sexual harassment does not need to be motivated by a sexual desire and may involve members of the same sex. *Oncale*, 523 U.S. at 79. As the U.S. Supreme Court acknowledged in *Oncale*, the "many facets of human motivation" make it nearly impossible to establish conclusive presumptions about discriminatory acts. *Oncale*, 523 U.S. at 78. A plaintiff in a sexual harassment case may show that harassment was because of sex by offering "comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Oncale*, 523 U.S. at 80-81.

Whether Mitchell's conduct was discriminatory because of sex is an issue of fact. SJM argues that there is no evidence that Mitchell treated men and

---

[11] The Supreme Court's conclusion was supported by the broad language of Title VII of the Civil Rights Act, which prohibits "discrimination . . . because of . . . sex" in the terms or conditions of employment. *Id.* citing 42 U.S.C. § 2000e-2(a)(1). This language is similar to the language of the MHRA.

18

women differently, and there is no evidence that other female employee found Mitchell's conduct created a sexually hostile environment. However, the evidence suggests that Mitchell discriminated because of sex because he only targeted women with his conduct. Aside from the fact that Mitchell gave notes to Little to deliver to her boyfriend, and gave a Christmas card to deliver to her son, there is no evidence that Mitchell targeted men with his conduct. Moreover, it appears that the content of one of the notes (Little Depo, Ex. 4) and the card aimed to embarrass Little. In addition to harassing Little, the evidence shows that Mitchell also directed his comments toward Bookataub, Sherry Poitras, and Sue LaRoche, and possibly towards Nadine Nyder. This pattern of conduct directed at female co-workers suggests that Mitchell's discriminatory conduct was because of sex.

b. **Mitchell's Conduct was Both Objectively and Subjectively Offensive**

The sexually objectionable conduct must be both objectively and subjectively offensive -- such that a reasonable person would find it hostile or abusive, and the victim did in fact perceive it to be so. Sexual harassment "can take a myriad of forms including everything from excessive sexually-oriented "joking to demands for sexual favors." *Maine State Academy of Hair Design v. Commercial Union Ins. Co.*, 1997 ME 188, ¶ 8, 699 A.2d 1153, 1157. It is hard to draw the fine line between tasteless jokes and sexual harassment. The MHRA, like the federal Civil Rights Act, is not intended to provide a general civility code. *Oncale*, 523 U.S. at 81, 118 S. Ct. at 1002. The U.S. Supreme Court's analysis of Title VII of the Civil Rights Act provides guidance:

> Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at *"discrimination* . . . because of . . .

19

sex." We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations.

*Oncale*, 523 U.S. at 80, 118 S. Ct. at 1002. The requirement of an objectively hostile and abusive work environment "ensure[s] that courts and juries do not mistake ordinary socializing in the workplace – such as male-on-male horseplay or intersexual flirtation – for discriminatory conditions of employment." *Oncale*, 523 U.S. at 81, 118 S. Ct. at 1003. There is no question that Little was subjected to conduct that was objectively offensive. Mitchell gave Little two notes to deliver to her boyfriend and a Christmas card to deliver to her son, which alleged he engaged in sexual acts at the workplace with Little; he sent Little a text message commenting on the size of her breasts and another text message requesting a picture of her breasts; he made comments at work about Little's breasts; he talked about his genitals and other peoples' sexual activity at work; and he called Little "ugly."

Whether Mitchell's conduct was subjectively offensive to Little and altered Little's work environment is an issue of fact. SJM points out that co-workers observed Little's and Mitchell's relationship as friendly, and that they would joke and tease each other. According to SJM, Mitchell's conduct was simply sexual banter, and was not harassment. The facts show that Little never requested to have her hours or work station changed to avoid Mitchell. However, Little disputes SJM's characterization of her relationship with Mitchell, claims they were not friends, and that she had complained about Mitchell's conduct to Barrows and Stilphen. She claims that Mitchell's conduct contributed to her panic disorder, and was ultimately the reason she left her employment at

20

SJM. Whether Little's work environment was altered remains a question for the jury.

### c. Employer Liability

SJM argues that it should not be liable because there is no evidence from which a reasonable jury could infer that SJM management had notice of the harassment Little alleges. (Def.'s M. for Summ. J. at 9). In *Watt v. Unifirst Corp.*, the Law Court adopted the regulation issued by the Maine Human Rights Commission governing employer liability for the acts of co-workers. *Watt*, ¶ 26, 969 A.2d at 904 citing 11 C.M.R. 94 348 003-6 § 3.06(I)(3) (2007). Under that standard "employers may be liable for the sexual harassment of an employee by a co-worker or workers under a hostile environment claim where the employer *knew or should have known* of the charged sexual harassment and failed to take immediate and appropriate corrective action." *Watt*, ¶ 27, 969 A.2d at 904 (emphasis added). Under SJM's sexual harassment policy, employees may file a formal grievance with the SJM's Human Rights Director, or they may report suspected sexual harassment to a supervisor or the Human Rights Director. Additionally, the policy provides that "[s]upervisors and managers are responsible for monitoring behavior which can be construed to be harassment and for initiating necessary action to eliminate such behavior."

Whether SJM had notice of Mitchell's harassment towards Little is a question of fact. The evidence shows that Little (1) never made a formal complaint to Cote, the Human Rights Director, (2) never made a complaint in writing, and (3) never talked to Bookataub about Mitchell's conduct. Additionally, Barrows "checked in" with Little on several occasions and he testified that Little never objected to Mitchell's conduct, with the exception of

21

calling her "ugly." However, the evidence also shows that Stilphen and Barrows were both aware of the Christmas card, and that Barrows never followed up with Mitchell about the card even though Stilphen told him Little had complained to her. The evidence also shows that Bookataub and Barrows witnessed Mitchell comment on Little's breasts, that Barrows was aware that Mitchell had called her "ugly," and that Bookataub also was subjected to Mitchell's conduct, even if she perceived it to be a joke. A reasonable juror could find that under these circumstances the SJM's supervisors knew or should have known of Mitchell's conduct.

### 3. Constructive Discharge Claim

The test for a constructive discharge claim is whether a reasonable person facing such unpleasant workplace conditions would feel compelled to resign. *King v. Bangor Fed. Credit Union*, 611 A.2d 80, 82 (Me. 1992). If there is no hostile work environment there is no constructive discharge. *See Miller v. E. Maine Medical Ctr.*, Mem-09-169 (Oct. 13, 2009) citing *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004) (noting that facts that cannot support a hostile work environment claim cannot support a claim for hostile environment constructive discharge). Accordingly, the fate of this claim hinges on the outcome of the sexual harassment hostile work environment claim.

### 4. Disability Discrimination / Harassment Claim

Count IV of Little's Complaint alleges disclosure of confidential medical information in violation of the MHRA and the Rehabilitation Act. Neither the MHRA nor the Rehabilitation Act appear to provide a cause of action for disclosure of confidential information. SJM addressed Count IV as a claim for disability discrimination. It appears that Little has abandoned her claim under

22

Count IV because she has failed to counter SJM's motion for summary judgment on this claim.

If Count IV were construed as a claim for disability discrimination, it is insufficient to survive summary judgment. In order to make a claim that she was subjected to harassment based on her disability under the ADA or the MHRA, Little must show that (1) she was disabled, (2) she was subjected to a hostile work environment, and (3) that the hostility was directed at her because of her disability. *Quiles-Quiles v. Henderson*, 439 F.3d 1, 5 (1st Cir. 2006). To establish a hostile work environment based on her disability, Little must show that she was subjected to "repeated or intense harassment sufficiently severe or pervasive to create an abusive working environment." *Doyle*, ¶ 23, 824 A.2d at 57. Among the factors examined to determine whether an actionable hostile work environment claim exists are the frequency and severity of the harassment and whether it unreasonably interferes with the employee's work performance. *Id.*

Little stated during her deposition that Mitchell first learned about her panic disorder only a few days before resigning. Even assuming Little was disabled within the meaning of the MHRA, the ADA, or the Rehabilitation Act, her claim fails because she cannot show that Mitchell's conduct regarding her panic disorder was severe, frequent, or affected her work performance. Additionally, there is no evidence that Little reported any incidents in which Mitchell harassed her based on her disability before she decided to resign. Therefore summary judgment is granted on Count IV of Little's Complaint.

Therefore, the entry is:

Summary judgment is DENIED on Counts I, II, and III. Summary judgment is GRANTED on Count IV.


Dated at Portland, Maine this _____ 23ʳᵈ _____ day of _____ July _____, 2010.

Robert E. Crowley
Justice, Superior Court

TRUDY LITTLE  - PLAINTIFF

Attorney for: TRUDY LITTLE
GUY D LORANGER  - RETAINED 06/04/2009
NICHOLS WEBB & LORANGER PA
110 MAIN ST., SUITE 1520
SACO ME 04072


vs
SAINT JOSEPHS MANOR - DEFENDANT
1133 WASHINGTON AVENUE
PORTLAND ME 04103
Attorney for: SAINT JOSEPHS MANOR
MATTHEW J LAMOURIE  - RETAINED 03/29/2010
PRETI FLAHERTY BELIVEAU PACHIOS & HALEY
ONE CITY CENTER
PO BOX 9546
PORTLAND ME 04112-9546

Attorney for: SAINT JOSEPHS MANOR
ELIZABETH OLIVIER  - RETAINED 03/29/2010
PRETI FLAHERTY BELIVEAU PACHIOS & HALEY
ONE CITY CENTER
PO BOX 9546
PORTLAND ME 04112-9546

SUPERIOR COURT
CUMBERLAND, ss.
Docket No   PORSC-CV-2009-00330

**DOCKET  RECORD**

STATE OF MAINE                          SUPERIOR COURT
CUMBERLAND, ss                          CIVIL ACTION
                                        DOCKET NO. CV-09-330

TRUDY LITTLE,

        Plaintiff

        v.                              JUDGMENT

SAINT JOSEPH'S MANOR,

        Defendant

## BACKGROUND

On June 4, 2009, the plaintiff filed a four-count complaint and alleged sex discrimination, count I; hostile work environment, count II; constructive discharge, count III; and disclosure of confidential information, count IV. She based her allegations on the Civil Rights Act, the Americans with Disabilities Act, the Rehabilitation Act, and the Maine Human Rights Act.

On June 30, 2009, the case was removed to the United States District Court for the District of Maine. The defendant filed a motion for summary judgment. The motion was granted on all of the plaintiff's federal claims. On March 26, 2010, the case was remanded to this court for the plaintiff's remaining state claims.

On July 23, 2010, this court issued an order on the defendant's motion for summary judgment. The court determined that the facts in the record did not support a claim for gender-based discrimination and considered the plaintiff's claims in counts I and II as one for sexual harassment based on a hostile work environment. (MSJ Order at 15-16.) The court determined that the plaintiff was a member of a protected class and that she was subjected to conduct that was objectively offensive. (Id. at 17, 20.) The

1

court determined that the remaining requirements for the plaintiff's claim for sexual harassment based on hostile work environment were questions of fact. (Id. 18, 20-22.)

The court further determined that the allegations of constructive discharge in count III could not be considered absent a determination of the sexual harassment hostile work environment claim. The court granted the defendant's motion for summary judgment on count IV of the plaintiff's complaint.

Jury-waived trial was held on December 14-15, 2010. The court has considered the evidence, including the testimony of the plaintiff's eleven witnesses, the defendant's three witnesses, the parties' stipulations, the parties' exhibits, the LaRoche and Witmer depositions, and the defendant's interrogatory answer #20, read into the record, plaintiff's exhibit 17.

FINDINGS

In 1999, the plaintiff was diagnosed with anxiety disorder with panic attacks and began receiving disability benefits.[1] (Stip. ¶ 12.) She has been on medication, which helps her condition, since that time. She will take this medicine for the rest of her life. The panic attacks are very difficult to endure. She shakes, her heart races and skips beats, and she feels like she will die. She described her panic attacks as "torture." She has learned techniques to deal with these panic attacks.

The plaintiff also has had difficult periods in her personal life. She was abused by her father and aunt. She was abused also by her ex-husband, to whom she was married for eleven years and who was arrested on several occasions for domestic violence. (Def.'s Ex. 24 at 2-3.) She finally left her husband when he hit one of her children and lived in a shelter for a period of time. (Id. at 3.)

---

[1] The plaintiff's various Social Security records were admitted into evidence. (Def.'s Exs. 12-26.)

2

Because work serves as a distraction, the plaintiff tried to return to work. If she is comfortable in her environment, she is able to work. She worked at a pizza store one day per week. She was unemployed for three years because of her condition before she began working as a cook at Ruski's in late 2001 or early 2002. (Stip. ¶¶ 13-14.) She worked two days per week up to six hours per day. (Id. ¶ 13.)

The plaintiff applied for a job at the defendant, Saint Joseph's Manor (SJM), in 2006. The job included benefits, which were attractive to her. At this time, her anxiety disorder was under control.

The plaintiff was employed by SJM from May 29, 2006 to July 28, 2007 as a cook supervisor. The annual benefits provided by SJM totaled $8,101.93. (Pl.'s Ex. 17.) Based on her last paycheck, she had earned $17,294.20 for 2007 when she left her employment at SJM. (Pl.'s Ex. 14.)

At the beginning of her employment, the plaintiff received a general orientation and the SJM policy handbook from Mary Cote, SJM's Human Resources Manager. (Def.'s Ex. 2.) The plaintiff worked in the kitchen near Joe Mitchell, a cook supervisor at SJM. (Def.'s Exs. 4, 31.) Their shifts overlapped four days per week; she worked from 11:30 a.m. to 8:00 p.m. and Mr. Mitchell's shift ended at 1:00 p.m.

Mr. Mitchell began working at SJM in 1982. He became a cook supervisor in the early 1990s. He has no authority to hire or fire kitchen employees, such as the plaintiff. He reports to Adam Barrows and Jill Bookataub.

Mr. Mitchell read but was not trained on SJM's sexual harassment policy. (Pl.'s Ex. 1 at 3, ¶¶ 2 & 10-11; Def.'s Ex. 9.) He testified first that he did not understand that he had any obligation to enforce the policy. He believed the administration and management had to enforce the policy. He was then shown, during his testimony, the language requiring supervisors' responsibility for "monitoring behavior which can be

construed to be harassment and for initiating necessary action to eliminate such behavior." (Pl.'s Ex. 1 at 11.) He then testified that he did have a duty to make sure the policy is followed but also stated it was not up to him to decide if there was a violation. Instead, he would report to Mr. Barrows. He had never reported an incident of sexual harassment at SJM. Ms. Cote also had to refresh her recollection of the reporting requirements of the SJM sexual harassment policy while she was on the witness stand. (Def.'s Ex. 9.)

According to Mr. Mitchell, the plaintiff and he discussed family, boyfriends, sex, and the plaintiff's breasts. He agreed he made sexual comments but did not know if they were offensive. He agreed he sent the texts to the plaintiff. (Pl.'s Exs. 2-7.) He did not consider these texts a violation of the SJM policy. He agreed he told her the plaintiff was ugly but testified that he did not say this in a mean way; he thought it was funny. She laughed but he later learned she was really hurt. He agreed he might have said to the plaintiff, "Fuck it. I call it as I see it." He agreed that he wrote notes to the plaintiff and thought they were funny. (Pl.'s Exs. 8-10.)

Mr. Mitchell testified that the plaintiff called him her special little Joe-Joe, called him "a fag," called him "pee-pee puffer," and swore frequently, using the "F word" often. He testified that the plaintiff's response to the texts was, "my God, you are funny" and her fiancé's response to the note was that Mr. Mitchell was "a crazy shit.' (Pl.'s Exs. 8, 10.) Mr. Mitchell testified that the plaintiff discussed her son's penis size and said it would be "awesome" and "funny" if Mr. Mitchell sent a card and underwear to her son. Mr. Mitchell stated he received texts from the plaintiff but deleted them. He received no notes from her.

No one from SJM discussed the notes with Mr. Mitchell while the plaintiff was employed at SJM. After she left, management discussed his inappropriate behavior.

Mr. Mitchell was suspended for three days. He has received a total of three written warnings during his employment at SJM. In retrospect, Mr. Mitchell testified that he does not think his conduct was funny.

The plaintiff agreed that she and Mr. Mitchell engaged in banter but denied sexual connotations. During her first week at work at SJM, she sprayed water around her work area. Mr. Mitchell said to her, "you are so fucking stupid." As a result, she felt hurt and stupid. She did not say anything because she did not know him. During a thunderstorm, Mr. Mitchell threw his arms around the plaintiff and said he was terrified of storms.

During the first weeks of her employment, there was no discussion between the plaintiff and Mr. Mitchell about the plaintiff's fiancé, George Asali, or her intimate life. Eventually Mr. Mitchell began to engage in conduct the plaintiff found offensive. He talked about sexual things to the plaintiff and others that she found inappropriate. He folded an offensive and vulgar letter on wax paper[2] and told the plaintiff to give the letter to her fiancé. (Pl.'s Ex. 10.) The plaintiff read the letter and was shocked and began having problems with panic attacks. She showed the letter to co-worker Melissa Libby, who was disgusted.

The plaintiff next showed the letter to Faith Stilphen, the SJM Director of Nursing from 1997 to 2009. Ms. Stilphen advised the plaintiff to show the letter to Mr. Barrows, the SJM Food Service Director and direct supervisor of the plaintiff and Mr. Mitchell. The plaintiff spoke to Mr. Barrows about the letter and believed she showed him the letter. She told him that she was offended and upset. She explained her panic disorder to him and told him she was having a hard time dealing with the incident. Mr. Barrows said he would take care of it.

The plaintiff knew Ms. Cote, who had conducted the plaintiff's orientation. The plaintiff had never worked previously in any place that had a human relations department. The plaintiff thought she should report the problems with Mr. Mitchell to Mr. Barrows, her direct supervisor.

The next day, the plaintiff told Mr. Mitchell that she thought the letter was disgusting. He replied that she could not take a joke and that the letter was a joke. She continued to try to maintain a civil relationship with Mr. Mitchell because she had to work with him.

During the next day, Mr. Mitchell inquired regarding the plaintiff's mental condition. The plaintiff admitted she swore at Mr. Mitchell. He then told other SJM employees to be nice to the plaintiff because of her mental condition.[3] She told him again that his conduct was disgusting.

Mr. Mitchell gave the plaintiff another offensive letter and told her to give it to Mr. Asali. (Pl.'s Ex. 8.) Once again, she read the letter and was disgusted. She had not encouraged Mr. Mitchell to write letters. She did not complain to management because nothing had been done about the first letter.

Just prior to Christmas, Mr. Mitchell gave a present to the plaintiff and a present for her son, Scott. She thought that Mr. Mitchell's giving a present to her son was odd but it looked like the boxes of chocolates Mr. Mitchell was giving everyone else. The present was an offensive card and underwear. (Pl.'s Ex. 9.)

The plaintiff had discussed her son with her co-workers in general terms. The plaintiff asked Mr. Mitchell what he was thinking when he sent the card. He replied

---

[2] The plaintiff was not sure of the order in which the letters were given.

[3] Mr. Mitchell testified that Ms. Stilphen and the plaintiff told him about the plaintiff's mental disorders. He agreed he could have said that people should be nice to the plaintiff because she is "crazy."

that he and Ms. Bookataub,[4] who was a member of management, thought it was funny and it was a joke. The plaintiff complained about the card to Ms. Stilphen. Ms. Stilphen agreed that the plaintiff complained to Ms. Stilphen about a Christmas card with sexual connotations sent by Mr. Mitchell to the plaintiff's son. Ms. Stilphen determined that SJM's policies required further action. She spoke to Mr. Barrows and told him what the plaintiff had told her. Ms. Stilphen made clear that the plaintiff was upset and embarrassed about the sexual nature of the card.[5] Mr. Barrows later told Ms. Stilphen that he had taken care of the issue. During his testimony, Mr. Barrows did not recall hearing about the card containing sexual references. He agreed that if he had, he would have had a duty to investigate and pass the information on the Human Resources. He did not recall seeing the card to plaintiff's son. Nothing was done by management regarding this card.

Mr. Mitchell began telling the plaintiff she was ugly and that she could not "hide ugly." She complained to Mr. Barrows that this was embarrassing and mean. Mr. Mitchell then called her ugly in front of Mr. Barrows, who spoke to Mr. Mitchell and told him to "knock it off." Mr. Mitchell responded that it was not his fault that the plaintiff could not take a "fucking joke." He said he calls it like he sees it, he always has, and Mr. Barrows knows that.

The plaintiff brought photographs of her children and grandchildren to show co-workers. Mr. Mitchell showed the photos to others and asked them how someone so ugly could have such good-looking kids and grandchildren. The plaintiff was embarrassed by these comments.

---

[4] Ms. Bookataub did not testify.
[5] Mr. Barrows denied this conversation. In fact, Mr. Barrows had little recall of events at SJM during the plaintiff's employment.

Mr. Mitchell referred to the plaintiff's breasts as big and told her she looked like a "floozie." He told the plaintiff to get her breasts out of his face at a meeting in front of other employees. Mr. Barrows witnessed this incident. Mr. Mitchell commented on the breasts of others, including Ms. Bookataub.

Mr. Mitchell sent texts to the plaintiff two or three times per week. Some had sexual connotations. (Pl.'s Exs. 2-6.) He once lay on the floor and said he would stick a broom handle "up his butt."

Mr. Mitchell made a statement to Sue LaRoche regarding a penis. She complained to Mr. Barrows and Ms. Bookataub. Ms. Bookataub told Mr. Mitchell to stop. (LaRoche Dep. at 6.)

Mr. Mitchell sent a text about Sherry Poitras. (Pl.'s Ex. 7.) The plaintiff showed the text to Ms. Poitras, who did not seem upset and stated, "that's Joe." He referred to having sex with Ms. Bookataub in front of her and the plaintiff. Ms. Bookataub joked about it and did not seem offended.

At some point, the plaintiff had a house-warming party. She put an invitation on the wall for everyone at work. Mr. Mitchell attended the party. Neither the plaintiff nor Mr. Asali confronted Mr. Mitchell about his conduct.

Several current employees of SJM testified, in general, that nothing amiss occurred between the plaintiff and Mr. Mitchell and that he was a good person to work with. Most of the SJM employees who testified appeared concerned about the ramifications of their testimony. The court found Mr. Mitchell, in particular, to be not credible and Mr. Barrows had either a selective memory or no memory at all regarding the events at SJM during the plaintiff's employment.

In spite of that theme, some current employees' testimony supported the plaintiff's allegations. Sally Butland worked with the plaintiff and Mr. Mitchell. Ms.

8

Butland did not hear the plaintiff make sexual comments at work or to Mr. Mitchell. Ms. Poitras, a reluctant witness, was shown the letter from Mr. Mitchell to the plaintiff's son. (Pl.'s Ex. 9.) Ms. Poitras was not surprised to see the letter based on the way Mr. Mitchell joked at work. Herbert Dick did recall some sexual comment about the plaintiff's son. Henry Witmer heard Mr. Mitchell call the plaintiff ugly but emphasized Mr. Witmer has a "terrific" relationship with Mr. Mitchell. Amanda Irving recalled that the plaintiff's feelings were hurt when Mr. Mitchell said she was ugly.

The plaintiff's level of anxiety increased and toward the end of her employment, she was having panic attacks frequently. (Def.'s Ex. 24 at 1.) During one panic attack, the plaintiff asked one of the cooks if she could arrive at work early to relieve the plaintiff but the cook was unable to do so. At one point, the plaintiff thought she was having a heart attack. She called one of the SJM nurses, who talked the plaintiff through the episode. The plaintiff eventually was examined by a cardiologist to confirm she was not having heart problems. (Def.'s Ex. 6.)[6]

Mr. Barrows called the plaintiff to his office and said that she was acting quiet and nervous. She told him she could not deal with Mr. Mitchell's conduct and statements any longer. Although she had learned techniques to deal with anxiety, she could not control her anxiety at this time.

Donna Correll, the plaintiff's sister and a credible witness, recalled the plaintiff was very excited about the job at SJM. The plaintiff was doing well when she began the job and, notably, was able to seek full-time employment. Ms. Correll recalled the plaintiff calling several times about Mr. Mitchell's conduct, including the letters and the

---

[6] Mr. Mitchell was not mentioned in the report of Dr. Hoag, the cardiologist who examined the plaintiff on July 9, 2007. (Def.'s Ex. 6.) The plaintiff also did not discuss with Dr. Hoag her grandson's illness and the problems with her tenants, which were other sources of stress in her

text messages. The plaintiff was upset and her panic attacks were becoming more difficult. The plaintiff did not, however, follow her sister's advice and call her supervisor after each incident.

Ms. Correll describes her sister as having suffered from anxiety all her adult life, although she tried to keep it hidden. She was also someone who has allowed herself to be treated poorly for her entire life.

Andrea Trynor-Kenney, a credible witness, is a good friend of the plaintiff. They are each other's safe person when one is having a panic attack and have learned to talk each other "off the edge." When the plaintiff began working at SJM, she was in the best place Ms. Trynor-Kenney had seen the plaintiff in years. As the job continued, the plaintiff called Ms. Trynor-Kenney regarding Mr. Mitchell's conduct. The plaintiff's emotional state was disintegrating. Mr. Asali, also a credible witness, described the plaintiff as a "basket case" at the end of her employment at SJM. (See Def.'s Ex. 18.)

The plaintiff decided to leave her employment at SJM. She wrote a letter dated July 28, 2007 to Mr. Barrows and Ms. Bookataub. (Pl.'s Ex. 11.) This was a difficult decision for the plaintiff because she considers her employment at SJM to have been the best job she ever had. She lost her benefits when she left. (Pl.'s Ex. 17.) Except for her treatment by Mr. Mitchell, she liked her job, her co-workers, and the residents, although she was unhappy about scheduling on occasion, as were most SJM employees. No one from SJM management contacted her after she submitted her letter.

Ms. Cote learned of the plaintiff's difficulties at SJM when she received a letter from the Maine Human Rights Commission. Ms. Cote testified the letter was vague and she did not understand it. During her testimony, she was unwilling to state whether

---

life. She saw Dr. Hoag because she was in the midst of a panic episode and thought she was dying. The report, dated July 9, 2007, documents her increased anxiety and panic.

the information from the MHRC provided a basis for a violation of SJM's sexual harassment policies. She testified that she needed more information to comment.

After her investigation, including discussions with Mr. Mitchell and other employees, SJM determined that interaction between Mr. Mitchell and the plaintiff was "mutual," although Ms. Cote was not aware of anyone, except Mr. Mitchell, who substantiated that the plaintiff engaged in sexual discussions. During the investigation, Mr. Barrows confirmed that the plaintiff complained about Mr. Mitchell's calling her ugly. Because Mr. Barrows "was not clear" on the Christmas card issue, Ms. Stilphen was consulted. Ms. Stilphen agreed the plaintiff had complained about the card and Ms. Stilphen spoke to Mr. Barrows about the need to follow up. Ms. Cote testified that she did not know that Mr. Barrows did not follow up on the card and that he said he had followed up. In fact, Mr. Barrows testified he did not recall a conversation about the plaintiff being upset about the card's sexual references and he did not see the card.

When asked whether Mr. Barrows violated the sexual harassment policy, assuming he was told that the plaintiff was upset about the sexual references in the card and did not follow up with the plaintiff or HR, Ms. Cote testified that she would not say he violated the policy but that he did not follow the policy. This is a distinction without a difference and illustrates the defendant's approach to the environment at SJM.

After leaving SJM, the plaintiff next worked at a restaurant, Bruno's as a cook in August 2007. (Stip. ¶ 1.) She could not do the work because of panic attacks. She left in September 2007, reapplied for disability, and was evaluated by Christopher Muncie, Psy.D.[7] (Id. ¶¶ 3-4; Def.'s Ex. 24.) She was approved for disability in December 2007

---

[7] The parties stipulated that Mr. Mitchell was not mentioned in the report of Dr. Muncie's evaluation of the plaintiff on 11/5/07. (Def.'s Ex. 24.) The report provides that the plaintiff "stated that she recently had to leave her former place of employment in the end of June 2007 due to the increasing symptoms of panic." (Def.'s Ex. 24 at 1.)

11

based on anxiety related disorders with panic attacks. (Stip. ¶¶ 5-6.) She was unemployed until she returned to work part-time at Bruno's Restaurant in November 2008. (Id. ¶¶ 4, 8.) She stopped working at Bruno's in June and July 2009 because of tendinitis. (Id. ¶ 10.) She returned to Bruno's in August 2009 and worked one day per week, six hours per day. (Id. ¶ 11.)

The plaintiff's adjusted gross income for calendar year ending 12/31/07 was $17,294.00. (Id. ¶ 2; Def.'s Exs. 10-11.) Her adjusted gross income for calendar year ending 12/31/08 was $1,034.67. (Stip. ¶ 9; Def.'s Ex. 10.)

Her current job at Bruno's Restaurant is hard work. The open kitchen is in plain view of the public. She cooks now for the public, which is more stressful to her than the SJM work. She eventually wants to work full-time, however; it is important that she work so she does not become agoraphobic again.

DISCUSSION

A. Sexual Harassment

"Beginning in 1986, the Supreme Court has recognized that a claim for unlawful employment discrimination under Title VII of the Civil Rights Act may be based on sexual harassment sufficiently severe or pervasive that it creates a hostile work environment." Watt v. Unifirst Corp., 2009 ME 47, ¶ 22, 969 A.2d 897, 902 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66-67, 73 (1986)). The Maine Human Rights Act (MHRA) "also authorizes employment-related claims of sexual harassment based on a hostile work environment." Watt, 2009 ME 47, ¶ 22, 969 A.2d at 902 (citing 5 M.R.S. § 4572(1)(A); 11 C.M.R. 94 348 003-6 § 3.06(I)(1)(c) (2007) (regulations issued by the Maine Human Rights Commission)); see also Nadeau v. Rainbow Rugs, Inc., 675 A.2d 973, 976-77 (Me. 1996); Forrest v. Brinker Int'l Payroll Co., 511 F.3d 225, 228 n.2 (1st Cir. 2007).

12

"To succeed on such a claim, the First Circuit has required that, pursuant to the MHRA, concurrent with Title VII, a plaintiff must demonstrate:

> (1) that she (or he) is a member of a protected class; (2) that she was subject to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

Watt, 2009 ME 47, ¶ 22, 969 A.2d at 902-03 (quoting Forrest, 511 F.3d at 228). "It is appropriate to look to analogous federal case law for guidance in the interpretation of the MHRA. Watt, 2009 ME 47, ¶ 22 n. 4, 969 A.2d at 903 (citing Bowen v. Dep't of Human Servs., 606 A.2d 1051, 1053 (Me. 1992)).

B. Hostile Work Environment

"A hostile work environment claim requires an examination of 'all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Watt, 2009 ME 47, ¶ 23, 969 A.2d 897, 903 (quoting Doyle v. Dep't of Human Servs., 2003 ME 61, ¶ 23, 824 A.2d 48, 56 (citation omitted)). To establish hostile work environment, a plaintiff must show harassing behavior "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment and creates an abusive working environment." Meritor Savings Bank, 477 U.S. at 67 (citation and quotation omitted). The United States Supreme Court has stated:

> But Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the

very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their . . . gender . . . offends Title VII's broad rule of workplace equality.

Harris v. Forklift Systems, Inc., 510 U.S. 17, 22 (1993).

## C. Constructive Discharge

With regard to constructive discharge as unlawful employment discrimination, the MRHA is interpreted according to Title VII. See 5 M.R.S.A. § 4572(1)(A) (2009); Title VII, Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a) (2010). Under the comparable federal act, "discharge" includes situations "where, although not formally discharged by the employer, the employee has no reasonable alternative to resignation because of intolerable working conditions." King v. Bangor Federal Credit Union, 611 A.2d 80, 82 (1992). "The test is whether a reasonable person facing such unpleasant conditions would feel compelled to resign." Id. This is the test used by the First Circuit. See Greenberg v. Union Camp Corp., 48 F.3d 22, 27 (1st Cir. 1995) ("evidence must support a finding that . . . working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign"). To establish constructive discharge, the plaintiff

> must show that the abusive working environment became so intolerable that her resignation qualified as a fitting response. An employer may defend against such a claim by showing both (1) that it had installed a readily accessible and effective policy for reporting and resolving complaints of sexual harassment, and (2) that the plaintiff unreasonably failed to avail herself of that employer-provided preventive or remedial apparatus.

Pa. State Police v. Suders, 542 U.S. 129, 133-34 (2004).

## CONCLUSIONS

The defendant's position appears to be that only the plaintiff was required to conduct herself in a reasonable and mature fashion while employed at SJM. It is undisputed on this record that Mr. Mitchell engaged in regrettable, demeaning,

14

sexually harassing conduct that he believed was funny. Yet the defendant argues that the plaintiff is at fault for not dealing with this conduct appropriately while the defendant's management did not deal with this conduct at all.

The defendant makes much of the fact that the plaintiff made an effort to maintain a working relationship with Mr. Mitchell and did not confront him when he appeared at her party. This is a woman who was abused for significant periods of her life and who acquiesced. She does not confront; she appeases. As her sister observed, the plaintiff has allowed people to treat her badly for her entire life. Mr. Mitchell was just one of many.

A.  Sexual Harassment Hostile Work Environment

a.  Unwelcome Sexual Harassment Based on Sex

It is undisputed on this record that Mr. Mitchell made gestures and comments, and sent notes and texts, to the plaintiff. He also made sexually degrading comments to other female employees. The use of "sexually degrading, gender-specific epithets" constitutes harassment based on sex.[8] Forrest, 511 F.3d at 229. The plaintiff did not welcome Mr. Mitchell's conduct and found it offensive.

b. Harassment Sufficiently Pervasive

Mr. Mitchell's conduct was sufficiently pervasive to create an abusive work environment. This was not "simple teasing, offhand comments, and isolated incidents." Crowley v. L.L. Bean, Inc., 2001 U.S. Dist. LEXIS 11039, at * 52 (D. Me. May 8, 2001). This involved vulgar, frequent statements, written and verbal, and gestures directed toward the plaintiff or other women in her presence.

---

[8] The fact that Mr. Mitchell embarrassed the plaintiff about her emotional problems, a gender-neutral act, does not negate his other conduct based on sex.

15

## c. Conduct Subjectively Offensive

The plaintiff was disgusted, offended, and humiliated by Mr. Mitchell's conduct. She found her environment to be hostile and abusive. Crowley, 2001 U.S. Dist. LEXIS 11039, at * 54.

## d. Basis for Employer Liability

Finally, a basis for employer liability has been established. Mr. Mitchell's regrettable conduct was well known to the SJM employees and members of management, including Mr. Barrows and Ms. Bookataub. No action was taken except to tell Mr. Mitchell to "knock it off" or "stop." Although Mr. Barrows was informed of the Christmas card and that the plaintiff was offended by the sexual references, he did not follow through as required. Mr. Barrows witnessed Mr. Mitchell telling the plaintiff to get her breasts out of his face at a meeting in front of other employees. Mr. Mitchell commented on the breasts of others, including Ms. Bookataub. Management took no action. Mr. Mitchell discussed having sex with Ms. Bookataub in front of her and the plaintiff. Ms. Bookataub did nothing except joke. SJM knew about the sexual harassment and "failed to implement prompt and appropriate corrective action." Id. at *57.

## B. Constructive Discharge

The "constructive discharge standard is more onerous than the hostile work environment standard." Bodman v. Me., Dep't of HHS, 720 F. Supp. 2d 115, 123 (D. Me. 2010). The plaintiff must suffer from "working conditions so intolerable that a reasonable person would have felt compelled to resign." Id. (quoting Pa. State Police, 542 U.S. at 147). This is an objective standard as opposed to a subjective standard. Based on her particular circumstances, the plaintiff perhaps felt compelled to resign.

Mr. Mitchell's conduct would not, however, have mandated the resignation of a reasonable person. "[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress." Pa. State Police, 542 U.S. at 147 (quoting Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1015 (7th Cir. 1997).

## C. Damages

### a. Compensatory Damages

The MHRA provides for compensatory damages for "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 5 M.R.S. § 4613(2)(B)(8)(e); Kopenga v. Davric Maine Corp., 1999 ME 65, ¶ 18, 727 A.2d 906, 910. Through learned techniques and medicine, the plaintiff's anxiety disorder and panic attacks were under control at the time she applied for a full-time job and began work at SJM. Her anxiety levels increased significantly during her employment at SJM; she was having panic attacks frequently toward the end of her employment. At one point, the plaintiff thought she was having a heart attack and a SJM nurse talked the plaintiff through the episode. She sought an evaluation from a cardiologist because of concerns of heart problems. Certainly the plaintiff's psychological difficulties did not begin at SJM but the environment there caused a serious exacerbation of her panic attacks.

### b. Back Pay

Where there is no actual discharge, a plaintiff must prove that she was constructively discharged to receive "damages flowing from the loss of her job (most notably back pay and front pay)." Bodman, 720 F. Supp. 2d at 123; Ginn v. Kelley Pontiac-Mazda, Inc., 2004 ME 1, ¶¶ 2-3, 841 A.2d 785, 786.

17

c. Punitive Damages

The plaintiff is not entitled to punitive damages. She has not proved by clear and convincing evidence that the defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the rights of an aggrieved individual." Batchelder v. Realty Res. Hospitality, LLC, 2007 ME 17, ¶¶ 13-14, 914 A.2d 1116, 1121-22.

The entry is

> Judgment is entered in favor of the Plaintiff Trudy Little and against the Defendant Saint Joseph's Manor on Counts I and II of the Plaintiff's Complaint in the amount of $20,000.00 plus prejudgment interest at the rate of 3.40% and post-judgment interest at the rate of 6.30% plus costs.
>
> Judgment is entered in favor of the Defendant Saint Joseph's Manor and against the Plaintiff Trudy Little on Counts III and IV of the Plaintiff's Complaint.

Date: April 22, 2011

Nancy Mills
Justice, Superior Court

18

TRUDY LITTLE VS SAINT JOSEPHS MANOR
UTN:AOCSsr  -2009-0060064                    CASE #:PORSC-CV-2009-00330
----------------------------------------------------------------------

01 0000003675          OLIVIER, ELIZABETH
   ONE CITY CENTER PO BOX 9546 PORTLAND ME 04112-9546
   F      SAINT JOSEPHS MANOR                      DEF      RTND    03/29/2010

02 0000008426          LAMOURIE, MATTHEW J
   ONE CITY CENTER PO BOX 9546 PORTLAND ME 04112-9546
   F      SAINT JOSEPHS MANOR                      DEF      RTND    03/29/2010

03 0000009294          LORANGER, GUY D
   110 MAIN ST., SUITE 1520 SACO ME 04072
   F      TRUDY LITTLE                             PL       RTND    06/04/2009